**UNITED STATES of America, Plaintiff-Appellant,**

**v.**

**Vertis McMANUS, Defendant-Appellee.**

**No. 82–1725.**

United States Court of Appeals, Sixth Circuit.

Argued May 19, 1983.

Decided Oct. 28, 1983.

---

John A. Smietanka, U.S. Atty., Martin Palus, Asst. U.S. Atty. (argued), Grand Rapids, Mich., for plaintiff-appellee.

H. Rhett Pinsky (argued), Pinsky, Smith & Soet, Grand Rapids, Mich., for defendant-appellee.

Frank J. Kelley, Atty. Gen., Louis J. Caruso, Sol. Gen., E. David Brockman and Paul L. Bricker, Asst. Attys. Gen. (argued), Detroit, Mich., for amicus curiae.

Before ENGEL and CONTIE, Circuit Judges, and GUY, District Judge.*

RALPH B. GUY, Jr., District Judge.

On October 22, 1982, the defendant, Vertis McManus, was charged in a two-count indictment with violations of 18 U.S.C. § 1014, making false statements to a federally insured bank in connection with loan applications.[1] Subsequent to indictment, the defendant filed a motion to suppress

---

* Honorable Ralph B. Guy, Jr., United States District Judge for the Eastern District of Michigan, Southern Division, sitting by designation.

1. 18 U.S.C. § 1014 provides: "Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way ... any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation or any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment or loan or any change or extension of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both."

certain evidence seized by state officials pursuant to the execution of a state search warrant and subsequently turned over to the FBI for use in the federal prosecution. On July 2, 1982, defendant's motion to suppress was denied; however, he filed a motion for reconsideration. On August 23, 1982, the district judge reversed his earlier ruling and granted defendant's motion to suppress. It is from this ruling that the government appeals, pursuant to the authority granted by 18 U.S.C. § 3731.

For the reasons hereinafter stated, we reverse.

On November 29, 1977, defendant secured a $30,000 loan from the Inter-City Bank, Benton Harbor, Michigan. On January 21, 1979, the defendant borrowed an additional $12,000 from the bank. On both occasions, defendant listed as collateral a Burroughs Corporation computer. Defendant was a general insurance agent with offices in Benton Harbor, Michigan, and he stated to the Bank that the computer was used in a branch office in Muskegon, Michigan. In truth, defendant had neither a branch office nor a Burroughs computer; however, these facts only came to light in the process of a separate state investigation being conducted relative to defendant's failure to pay state income taxes for the years 1977, 1978, and 1979.

On January 7, 1980, in connection with the state tax investigation, an investigator for the Berrien County Prosecuting Attorney's Office secured two search warrants from the local state district court authorizing a search of defendant's Benton Harbor home and office. Both search warrants were supported by the same affidavit and both authorized a search for:

> Any and all business and financial records to show income received by Vertis McManus, Jr., or Vertis McManus, Jr., Ltd., during calendar years 1977, 1978, and 1979, including, but not limited to books of account, insurance policy records, commission records, personal and business

banking records, profit and loss statements, and personal and corporate income tax returns for tax years 1977, 1978, and 1979.

■ During the execution of the search warrants, a number of business records were seized as well as some narcotics, resulting in a variety of state court charges against McManus. In connection with these state charges, McManus challenged the two search warrants at issue here, and on May 8, 1981, the Berrien County Circuit Court granted defendant's motion to suppress and quashed the state information. The State of Michigan appealed this suppression order, however, and on November 17, 1982, the Michigan Court of Appeals reversed and reinstated the state criminal charges against the defendant. The district judge below, of course, did not have the benefit of the appeals court decision at the time he granted defendant's motion to suppress. In any event, the state decisions would not have been controlling, since it is clear that a state search warrant being challenged in a federal court must be judged by federal constitutional standards. *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). The federal district court was thus required to make an independent determination of validity. Since this determination was essentially made on the written affidavit supporting the search warrants, our review is *de novo* and not limited to the "clearly erroneous" standard. *United States v. Nance,* 666 F.2d 353, 356 (9th Cir.1982); *United States v. Freeman,* 685 F.2d 942, 948 (5th Cir.1982).

There are two questions presented for *de novo* review to this court: (1) was the issuing magistrate presented with sufficient probable cause to justify the issuance of the warrants, and (2) were the documents seized and herein challenged within the scope of the warrants. Before addressing these two questions, it is helpful to return briefly to the facts.

The state officers executing the warrant were primarily looking for documents that would be evidence of defendant having sufficient income to have required him to file and pay state income taxes. Therefore, they were very interested in two promissory notes seized which indicated defendant had a branch office and a new, expensive computer housed therein. Heretofore the state had been unaware of any second business location for defendant. Following up on this lead to possible other sources of unreported income, the investigators went to Muskegon and learned that the branch office and the computer were both fiction. It thus became apparent that the collateral pledged for the two bank loans was non-existent, and the state turned this information over to the FBI who further investigated and ultimately secured this present indictment against defendant predicated upon the serendipitous discovery of the false statements made to secure the bank loans.

### Probable Cause

[A]ffidavits for search warrants such as the one involved here must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion . . . A grudging or negative attitude by reviewing courts will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

[A]lthough in a particular case, it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants.

*United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965).

If there were any doubts as to the continued vitality of *Ventresca*, they were erased by the United States Supreme Court when they decided *Illinois v. Gates*, ⸺ U.S. ⸺, ⸺ n. 10, 103 S.Ct. 2317, 2331 n. 10, 76 L.Ed.2d 527 (1983). *Gates* not only emphatically reaffirms the principles of *Ventresca*, but does so to the extent of considerably eroding the well-established *Aguilar-Spinelli* requirements.[2]

█ Since the starting point for our review is the great deference that must be shown to the initial magistrate's probable cause determination, it is now appropriate to turn to the affidavit itself upon which the determination of probable cause was made.[3]

The affidavit primarily establishes the following factors:

(1) affiant has been investigating defendant for six months;

(2) defendant was incorporated in Michigan since 1977 engaging in the business of insurance agent;

(3) defendant and his wife had made acquisitions which would indicate substantial income;

(4) defendant's wife was working and made a substantial verified salary;

(5) the affiant had actual knowledge of a lucrative insurance contract that defendant had with the City of Benton Harbor and the approximate fees generated therefrom;

(6) defendant has sworn in various loan applications to substantial regular income; and

(7) neither defendant nor his wife filed any personal or business tax returns with the State of Michigan for 1977, 1978, or 1979, nor were any filed in Illinois where defendant lived before coming to Michigan.

---

**2.** *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

**3.** The affidavit is reprinted in its entirety in Appendix A, *infra*.

Since the affidavit is facially relatively complete and detailed, it is helpful to look first at its alleged deficiencies according to the two judicial officers, one state and one federal, who examined it below and found it wanting.

The findings of the state trial judge can be dealt with briefly, since the Michigan Court of Appeals found he had premised his conclusions on an incorrect reading of the applicable Michigan law. The state judge did not really find inadequate probable cause *per se* but, rather, that in a state income tax investigation, the state should first exhaust its less onerous administrative powers of subpoena before resorting to the more drastic remedy of a search warrant. The problem with this analysis as pointed out by the Michigan Court of Appeals is that if the state does use its subpoena power first, it is then precluded from a criminal prosecution.[4] *People v. McManus,* 121 Mich.App. 380, 328 N.W.2d 636 (1982).

Although this court is not reviewing the state proceedings, they are deemed relevant both as part of the procedural history and because, to some degree, the rationale of the state trial judge permeated the decision in the federal district court. Although the federal district judge did not hold that there was a prior administrative hurdle that the state must get over, he was concerned that a search warrant would not issue simply because state records did not reveal the filing of a tax return. Both judges were obviously and appropriately concerned with the rather drastic remedy of a search warrant being used simply because the state has no record of one of its citizen's filing a tax return. Although this is a legitimate concern in the abstract, the facts of this case fully justify the issuing magistrate's

determination that there was probable cause to believe that state income tax laws were being violated.

To begin with, defendant was required to file both personal and corporate income tax returns. Furthermore, his wife was employed and required to file. Since there were no filings from any entity or individual, the possibility of misfiling or some inadvertent non-compliance was drastically reduced. Furthermore, the state took the extra precautionary step of checking in defendant's prior state of residence. Additionally, not only did defendant present the trappings of income through his office and residence, but the state had specific information relative to recent insurance contract income to defendant in substantial amounts. This income information was further confirmed by defendant's own loan applications in which he swore to an income of $6,300 per month.

Although probable cause is a relative standard, there is no doubt that it means more than bare suspicion or a mere possibility. However, as was stated in *Brinegar v. United States,* 338 U.S. 160, 174–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949):

[I]n dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. The standard of proof is accordingly correlative to what must be proved... [I]t has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves

---

4. [N]o person shall be excused from testifying or from producing any books, papers, records or memoranda in any investigation, or upon any hearing when ordered to do so by the commissioner, upon the ground that the testimony or evidence, documentary or otherwise, may tend to incriminate or subject him

to a criminal penalty; but no person shall be prosecuted or subjected to any criminal penalty for or on account of any transaction made or thing concerning which he may testify or produce evidence, documentary or otherwise, before the board or its agent. M.C.L.A. § 205.3; M.S.A. § 7.657(3).

to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

It is obvious that were defendant to go to trial solely on the evidence presented in the search warrant affidavit he might have defenses to the charge.[5] That is not the test, however. Here, the "practical considerations of everyday life," on which a reasonably prudent magistrate would act, would dictate that there was probable cause to believe that a well-established businessman with proven, significant sources of income who files no business or personal income taxes for three years is in violation of applicable state income tax laws.[6]

### The Scope of the Warrant

■ Since the records in question seized were promissory notes (security agreements) on the printed form of the Inter-City Bank of Benton Harbor, Michigan, they are obviously "banking records," and the search warrant *specifically* authorized the seizure of "banking records." Notwithstanding this, the court below correctly ruled that the term "banking records" must be read in conjunction with the modifying language in the warrant that related to the seizure of records "to show income received by Vertis McManus, Jr." The court then went on to hold that the notes do not show "income received." This reading of the warrant is unnecessarily narrow and restrictive. The notes seized are not simple promissory notes, but are complete security agreements. In addition to showing the amount owed, they also completely detail the collateral pledged to support the loan and its location. The agent who seized

these notes had been investigating defendant for six months and had never heard of the alternate business location nor the expensive computer referenced in the body of the notes. It was reasonable to infer from such fact that defendant had other heretofore unknown sources of income. Further, the loan for $30,000 called for repayment at a rate of $3,000 every 180 days at 9¼ percent interest, resulting in a total obligation of $37,631.25. It was both reasonable and prudent to deduce from this that defendant had substantial income sources of which the bank was aware or there never would have been a loan. The additional note for $12,000 issued subsequent to the $30,000 note further supports the conclusion that these notes, although evidence of indebtedness, are also evidence of income being received by the defendant.

■ Although not dealt with in the district court, defendant also attacks the warrants on the basis of staleness. This argument is totally misplaced. Staleness can refer both to what is being searched for and the location where such evidence allegedly is to be found. Here, we are dealing only with business records. In the second paragraph of the search warrant affidavit, the affiant indicates he has been investigating the defendant since June of 1979. Since the search warrant issued on January 7, 1980, this provides a maximum six-month time frame for all the information contained therein. The locations to be searched were defendant's home and business, which locations were not only verified by official records but by personal observation and discussion with a neighbor. Since

---

**5.** In this regard, the United States Supreme Court stated in *Gates, supra,* —— U.S. at ——, 103 S.Ct. at 2330:

> As early as *Locke v. United States,* 7 Cranch. 339, 348 [3 L.Ed. 364] (1813), Chief Justice Marshall observed . . . that "the term 'probable cause' . . . means less than evidence which would justify condemnation . . . It imparts a seizure made under circumstances which warrant suspicion." . . . Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no

place in the magistrate's decision. . . . [I]t is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli, supra,* 393 U.S. at 419 [89 S.Ct. at 590].

**6.** "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." —— U.S. at ——, 103 S.Ct. at 2332.

defendant was being investigated for the tax years 1977, 1978, and 1979, any relevant information obtained between June of 1979 and January 1, 1980, simply could not be stale as a matter of definition. It certainly would be reasonable for a magistrate to conclude that on January 7, 1980, defendant's business records for the years 1977, 1978, and 1979 would be found at either his place of business or his residence. As the Fifth Circuit stated in *United States v. Freeman,* 685 F.2d 942, 952 (1982), "[t]hese items (passports, identification papers and *bank records*) are the sort which would normally be kept at one's personal residence. They are also the sort *which could be reasonably expected to be kept there for long periods of time.*" (Emphasis added.)

The district court decision to suppress the search warrant is reversed and this matter is remanded to the district court.

### APPENDIX "A"

### AFFIDAVIT

STATE OF MICHIGAN )
               ) SS.
COUNTY OF BERRIEN)

THOMAS R. SCHADLER, being first duly sworn, deposes and states:

1. THAT he has been employed as a Police Officer for over twelve (12) years, and since May 1979, has been employed as an Investigator for the Berrien County Prosecuting Attorney.

2. THAT he has been conducting an investigation of a local insurance agent, Vertis McManus, Jr., D/B/A Vertis McManus, Jr., Ltd., a Michigan Corporation, since June of 1979.

3. THAT according to records of the Michigan Department of State, a copy of which are in the possession of your affiant, Vertis McManus, Jr., Ltd., was incorporated as a Michigan Corporation on April 6, 1977, with a business address of 777 Riverview Drive, Building "D", Suite 207, Benton Harbor, Michigan. The nature of the corporate business was described as "Insurance Agent". The business was incorporated by Vertis McManus, Jr., and Kathryn McManus, who listed their residence at that time as 647 Washington Boulevard, Oak Park, Illinois.

4. THAT records at the Berrien County Register of Deeds Office show that in June of 1978, Vertis and Kathryn McManus, husband and wife, purchased a residence at 681 Pipestone, City of Benton Harbor, Michigan, for a price of $28,500.00. According to Joel Patterson, Mayor of the City of Benton Harbor, who lives next door, they have continually resided at that address since that time.

5. THAT the 1978 Polk's Benton Harbor-St. Joseph City Directory on Page 246, listed Vertis McManus as Manager of the Connecticut General Life Insurance Office, and gave his residence as 681 Pipestone Street, City of Benton Harbor, Michigan.

6. THAT your affiant has received information from Randall C. Arnt, Chief Investigator for the Berrien County Prosecutor's Office, that Mr. Irv Green of Consumer Investment, the firm that manages the 777 Riverview Drive Office Complex in Benton Harbor, told Mr. Arnt that Vertis McManus Jr., had rented office space at that complex from September of 1976 to July of 1979, as General Agent for the Connecticut General Life Insurance Company, and that McManus had been on his own since July, 1979, and had moved his offices to Suite 212 of that complex.

7. THAT the 1979–1980 phone directory for Benton Harbor-St. Joseph contains a half page ad on Page 166 of the yellow pages, under the listing of insurance, for the McManus Agency located at 777 Riverview Drive, Building "D", Suite 212, future office at 951 Pipestone.

8. THROUGH personal knowledge and reviewing City of Benton Harbor records and as a former Benton Harbor City employee, your affiant knows that in 1977, Vertis McManus initiated a health and accident insurance program for Benton Harbor City employees through Pension and Group

Actuarial Services, Inc. of Kalamazoo, Michigan, and has received a fee of $1.50 per person, per month, from February 9, 1977, to date. There are an average of 275 people on the program, which represents a fee of approximately $412.40 per month, or a total fee of approximately $4,940.00 per year.

9. KATHRYN McMANUS, wife of Vertis McManus, Jr., is employed as a teacher with the Benton Harbor School District since September of 1978, with an annual salary of $17,000.00.

10. THAT your affiant has seen a Section 312 Rehabilitation Loan Application filed with the City of Benton Harbor during 1979 by Vertis McManus, Jr., wherein Vertis McManus, Jr., claims an income of $5,000.00 per month for himself, $1,300.00 per month for his wife, (for a total joint monthly income of $6,300.00) and $1,000.00 per month in business expense.

11. YOUR affiant has received information from David Nummer, an Investigator for the Michigan Department of Treasury, that a check of the records of that department show that no Michigan State Income Tax Returns had been filed for 1977 or 1978 by Vertis McManus, Jr., individually or jointly with his wife, Kathryn, or by Vertis McManus, Jr., Ltd. Further, Mr. Nummer reported that no Michigan Single Business Tax Returns had been filed Vertis McManus, Jr. or Vertis McManus, Jr., Ltd, for 1977, 1978, or 1979. Further, Mr. Nummer informs your affiant that Illinois Department of Treasury records also show that no Income Tax Return was filed in that State during 1978 for Vertis McManus, Jr., individually or jointly, or Vertis McManus, Jr., Ltd.

12. YOUR affiant further states that on January 3, 1980, a personal check of Suite 212 at 777 Riverview Drive found that the Vertis McManus Agency was no longer located there. Also, a visual observance of the previously proposed offices for the Vertis McManus Agency at 951 Pipestone Street, Benton Harbor, Michigan, found this location now occupied.

13. YOUR affiant states that in the A.M. hours of January 4, 1980, he and Chief Investigator Randy Arnt along with Investigator David Nummer went to 951 Pipestone Street, wherein Investigator Nummer enter the premises and found it now occupied by the Vertis McManus Agency.

This concludes your affiant's affidavit.

/s/ THOMAS R. SCHADLER,
THOMAS R. SCHADLER,
Affiant

Subscribed and sworn to before me, a Notary Public, in and for the County of Berrien, this 7TH day of JANUARY, 1980.

/s/ LYNN A. LANGE
LYNN A. LANGE, Notary Public
Berrien County, Michigan
My Commission Expires: 6–30–80
JCB/11