915 F.2d 1573
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas F. BUNDY and Timothy J. Mieras, Defendants-Appellants.
 Nos. 90-1298, 90-1299.
 United States Court of Appeals, Sixth Circuit.
 Oct. 5, 1990.
 
 Before KEITH and MILBURN, Circuit Judges, and WILLIAM K. THOMAS, Senior District Judge.*
 PER CURIAM:
 
 
 1
 Thomas Bundy ("Bundy") and Timothy Mieras ("Mieras") (collectively "defendants") appeal from the district court's judgments and sentencing orders entered pursuant to a jury verdict. For the reasons set forth below, we AFFIRM.
 
 I.
 A.
 
 2
 On September 16, 1989, United States Forest Service agents were conducting surveillance in the Huron/Manistee National Forest in Wilcox Township, Newaygo County. The officers had received information that a marijuana field was being cultivated at that location. After discovering the marijuana field, the agents were assigned to stake out this area.
 
 
 3
 That day, agents saw two subjects, later identified as Mieras and Bundy, approach the patch. One agent was sitting close to one of the known marijuana patches, hidden in the cover, when he heard voices approaching the area. Defendants, clad in camouflage fatigues instead of the blaze orange clothing required for all small game hunting, were carrying shotguns. Only one of the defendants had a small game hunting back tag as required by Michigan law.
 
 
 4
 While defendants were in the patch, Agent Marroquin and Agent Leroy Stratton overheard them discuss the growth of the plants and the desire to clip some of the better buds. Defendants spoke of removing the plants and placing them in a barn to dry. One of the defendants expressed some hesitation about doing so.
 
 
 5
 Defendants then discussed finding a footprint in the patch. One of the defendants vowed to shoot anyone he found in the marijuana patch, if they got in his way. Defendants then stood around and talked about the progress of their crops and the possibility of clipping some of the buds and using them to grow other plants. Shortly thereafter, one of the defendants mentioned smoking the marijuana.
 
 
 6
 Agent Marroquin waited until the subjects left the patch and then notified the forest service officers and the sheriff's department by radio that defendants: were heading towards the road; were armed; and should be considered hostile. Defendants were stopped by officers of the Forest Service and the Newaygo County Sheriff's Department, who searched them and placed them under arrest. At the time of their arrest, defendants were in possession of loaded shotguns.
 
 
 7
 Before Agent Marroquin set up his surveillance in the area of the marijuana patches, the area was shown to him by local officers. His attention was directed to a trap that was placed in the patch. Located along the walk way between the plants, the trap was set with its jaws open and camouflaged with soil. Other agents told Agent Marroquin that other traps were located throughout the two patches. As defendants were leaving the patch, they pulled all the traps to guarantee their safe return. These traps were subsequently recovered by the Newaygo County sheriff's investigators in the woods where defendants dropped them.
 
 
 8
 After taking defendants into custody, the agents and other officers went to the two marijuana patches and pulled the plants. There were approximately 132 plants of marijuana, a Schedule I nonnarcotic controlled substance, growing in the patches.
 
 
 9
 Ron Brouwer, the Chief Forest Service investigator in this case, had recently transferred to Michigan. He had prior experience in the forests of Washington, Oregon and Idaho. While operating in the western states, he received extensive training and experience investigating large scale marijuana growing operations. Based upon his training and experience, his observations of the fields, and other agents' reports of defendants' conversations, Agent Brouwer concluded that this was an ongoing, extensive marijuana cultivation operation. As such, his training and experience led him to conclude that records of this marijuana growing operation and other things that pertained to the operation might be located at defendants' residences in Grand Rapids. In addition, defendants had mentioned a drying area that they referred to as a barn. On September 17, 1989, the agents went to Grand Rapids as they had determined that Bundy had a residence on 44th Street in Wyoming, Michigan. Mieras resided on Coldbrook Street in Grand Rapids.
 
 
 10
 The agents first contacted Assistant United States Attorney John F. Salan to procure a search warrant. Mr. Salan, however, was unable to locate any of the support personnel for the United States Attorney's Office. Thus, his access to the necessary documents was barred. Tim McMorrow, Chief of the Appellate Division of the Kent County Prosecutor's Office agreed to prepare a search warrant. McMorrow came to the office and personally drafted the affidavits and search warrants that were used in this case. The search warrants were taken to two state district court judges in the districts of Wyoming and Grand Rapids respectively. The district court judges examined the affidavits and placed the affiant, Agent Brouwer, under oath. They subsequently issued the two search warrants. The warrants were executed by Wyoming police officers, Grand Rapids police officers, Forest Service agents and Newaygo County sheriff's deputies. The searches produced a considerable amount of evidence at each location, documenting defendants' involvement in a large-scale marijuana cultivation operation.
 
 
 11
 At the Mieras residence, the officers found the following items: pruning sheers; army issue booby trap simulators; No. 110 Conibear traps identical to those found in the fields in Newaygo County; individually labeled and dated plastic bags containing varying amounts of marijuana seeds; a marijuana seed catalogue from a seed bank in Holland entitled "Best Seed Bank"; several growing lamps that matched those found at the Bundy residence; a United States Army issue manual on booby traps; a manual on marijuana growing entitled "Home Grown Can Be Your Best"; a Lake County plat book; an AR-15 semiautomatic rifle with parts necessary for conversion to a fully automatic rifle; and thousands of rounds of .223 ammunition.
 
 
 12
 At the Bundy residence in Wyoming, Michigan, officers found a sophisticated indoor marijuana growing operation with approximately 142 marijuana plants under cultivation. This growing operation was found in an insulated, ventilated and thermostatically controlled garage attached to a greenhouse. Lighting was supplied by rotating growing lights. Also found at this location were packages of marijuana seeds that were labeled and dated in a manner similar to those found at the Mieras residence. The search also produced a packet of military-type explosive material believed to be C-4, a stolen handgun, and a similar AR-15 semiautomatic rifle with conversion parts. The various types of growing lamps, both the bulbous style and the tubular style, found at the Bundy residence match those found at the Mieras residence.
 
 
 13
 Subsequent investigation conducted by the Michigan State Police from the Reed City Post determined that on September 10, 1989, at 11:00 a.m., defendants were seen driving a one-ton Atlas rental truck at a marijuana patch in Lake County. Richard Graham observed defendants in Lake County while he was mushroom hunting. Defendants appeared to be loading something that looked like bushes into a truck. Graham testified that it looked like they were carrying marijuana plants which were still in pots. Graham relayed this information to the Michigan State Police along with a description and license number of the vehicle involved. On that same day, at 1:00 p.m., defendants were seen driving the same truck at the location where they were later arrested. A forest service employee and his wife, Tom and Marcia Walters, saw the truck at that location. They wrote down the license number of the truck and a description of the subjects involved. Later, they identified defendants. Marcia Walters testified that defendants seemed to be impatient as they hurriedly loaded what appeared to be brush into the truck.
 
 B.
 
 14
 On September 18, 1989, both defendants were arraigned before a federal magistrate on federal warrants and complaints. On September 19, 1989, a federal grand jury returned a three count indictment charging both defendants with: Count I, manufacturing and distributing 100 or more marijuana plants in and upon federal lands, in violation of 21 U.S.C. Sec. 841(b)(vii); Count II, knowingly and intentionally assembling, maintaining, placing and causing to be placed booby traps on federal lands where marijuana was being manufactured, in violation of 21 U.S.C. Sec. 841(e)(1); and Count III, knowingly and intentionally using and carrying firearms during and in relation to drug trafficking crimes, in violation of 21 U.S.C. Sec. 924(c)(1). A detention hearing was held before a federal magistrate; the government's motion for detention was denied, and defendants were released on $100,000 bond requiring $1,000 cash deposit and certain special conditions.
 
 
 15
 On October 11, 1989, a pretrial hearing was held before the federal magistrate; defendants were given two weeks from that date to file any and all motions. On October 25, 1989, defendants filed five motions and briefs. The pretrial motions were heard on November 20, 1989. On November 27, 1989, a jury was selected in this matter and on November 29, 1989 through December 5, 1989, a jury trial was held. The jury returned a verdict finding defendants guilty on all three counts of the indictment. On February 14, 1990, defendants were sentenced. Each defendant received a mandatory minimum five-year sentence on Count 1 and a five-year mandatory minimum sentence on Count 3. These sentences were required by law to be served consecutively. In addition, defendants each received a five year sentence on Count 2. Defendants were also sentenced to a four-year period of supervised release to be served after completing their prison sentences.
 
 II.
 A.
 
 16
 Defendants were indicted for manufacturing a controlled substance, manufacturing a controlled substance with intent to distribute, setting traps on federal land, and using and/or possessing firearms in the commission of a felony. Defendants filed a motion to suppress evidence on the grounds that the affidavits in support of the two search warrants lacked probable cause. Specifically, defendants contend that there were insufficient facts to establish the requisite nexus between their actions in Manistee National Forest, and the subsequent search of their residences in Grand Rapids.
 
 
 17
 In the November 20, 1990 motion hearing, the district court considered defendants' motion to suppress the evidence. The district court concluded that probable cause existed. Relying on People v. Rahn, 511 F.2d 290 (10th Cir.), cert. denied, 423 U.S. 825 (1975), the district court stated, "One cannot look at the facts in isolation. One has to look at the facts under the circumstances and under the logic of everyday experience to conclude whether or not probable cause existed."
 
 
 18
 The standard of review for a challenge of the written affidavits is de novo. See United States v. McManus, 719 F.2d 1395 (6th Cir.1983). The resolution of doubtful or marginal questions of probable cause should be largely determined by the preference accorded to warrants. Id. at 1398. Probable cause means more than a bare suspicion or mere possibility. This Court, therefore, is required to determine whether the facts contained in the affidavits would convince the magistrate to reasonably conclude that a sufficient nexus existed between them and the items expected to be found at defendants' residences which are located some distance from the marijuana patches. The nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inference of where one would likely keep such evidence. See United States v. Savoca, 761 F.2d 292, 298 (6th Cir.), cert. denied, 474 U.S. 852 (1985).
 
 
 19
 Agent Brouwer, who supervised the marijuana patch surveillance, executed the affidavits. Based on the conversations between defendants overheard by Agent Brouwer's staff during the surveillance, Agent Brouwer expressed his opinion that this type of alleged criminal activity tends to indicate that illegal activity or contraband might be located at the suspects' residences. He opined that most likely the crop would be distributed and a search of the premises would reveal evidence of the distribution. Agent Brouwer testified at trial that he was not present at the time defendants were observed in the patch or when they were subsequently arrested. The affidavit recounts that defendants were discussing the condition of the crop, their intention to harvest it, and their plans to store it in the barn to dry. The affidavits contain references to a "barn," yet neither of defendants' residences contains a barn. At Bundy's residence, however, agents discovered an insulated, ventilated, thermostatically controlled garage attached to a greenhouse.
 
 
 20
 After careful review, we find a sufficient nexus exists between the place to be searched and the items sought. Agent Brouwer had extensive experience in investigating the cultivation of unlawful substances; he sought evidence substantiating defendants' large scale marijuana manufacturing operation. In considering the type of crime, the nature of the items sought, and normal inferences about where a criminal might hide the crop, Agent Brouwer inferred that evidence of distribution would likely be found at defendants' residences. Defendants spoke of drying the crop in an area away from the marijuana patches. While neither residence contained a barn, they did have garages and a greenhouse which could easily serve the same storage and drying purposes. Therefore, the district court properly admitted the evidence seized by the officers.
 
 B.
 
 21
 At the lengthy motion hearing held on November 20, 1989, Mieras argued a motion to sever his trial from Bundy's trial. Mieras claimed evidence seized at the co-defendant's house was far more prejudicial than the evidence seized at his house. We conclude that denial of severance did not result in specific and compelling prejudice to Mieras. Moreover, Mieras did not preserve this issue for appellate review, as he failed to renew his motion at the close of all evidence.
 
 
 22
 The standard of review in the denial of a motion for severance is "abuse of discretion." See United States v. Davis, 809 F.2d 1194 (6th Cir.), cert. denied, 483 U.S. 1007 (1987). The courts have held that in cases such as these, the defendant must carry the heavy burden of showing specific and compelling prejudice resulting from a joint trial which can only be rectified by separate trials. United States v. Pickett, 746 F.2d 1129 (6th Cir.1984), cert. denied, 469 U.S. 1226 (1985).
 
 
 23
 Joinder in an indictment of the same act or transaction is permitted by the Federal Rules of Criminal Procedure. This Court has held that this rule " 'can and should be, broadly construed in favor of initial joinder, because of the protection Rule 14 affords against unnecessarily prejudicial joinder.' " United States v. Swift, 809 F.2d 320, 322 (6th Cir.1987) (quoting United States v. Franks, 511 F.2d 25, 28 (6th Cir.1975)).
 
 Rule 14 provides:
 
 24
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information ... the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.
 
 
 25
 A Rule 14 motion is left to the district court's sound discretion. This Court should not disturb the district court's denial of a severance without evidence that the district court abused its discretion. United States v. Gallo, 763 F.2d 1504, 1524-25 (6th Cir.1985), cert. denied, 474 U.S. 1068 (1986). To establish an abuse of discretion, the defendant must make a strong showing of prejudice. Id. at 1525. Severance is properly granted when the movant demonstrates the inability of the jury to separate and treat distinctively evidence relevant to each particular defendant. In this case, the record reveals that Mieras failed to meet this heavy burden.
 
 
 26
 To preserve the severance motion for appellate review, the movant must renew the motion at the close of the evidence. Swift, 809 F.2d at 323. At the end of the evidence, Mieras failed to renew the motion for severance. Pursuant to Swift, the motion is waived.
 
 C.
 
 27
 Defendants filed a motion in limine, seeking to prevent the testimony of several witnesses who placed defendants at the same Newaygo County marijuana patches and another patch located in Lake County six days before their arrest. The government submits that such evidence was properly admitted by the trial judge under Fed.R.Evid. 404(b). We find the government's argument persuasive.
 
 
 28
 Defendants denied any involvement in the crimes charged in the indictment. They claimed that they were simply poor hunters who blundered into a government stakeout and were wrongfully arrested. Thus, proof of their knowledge and intent was important to the government's case.
 
 Federal Rule of Evidence 404(b) states:
 
 29
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action and conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 30
 This rule has been described as a rule of inclusion rather than a rule of exclusion. See United States v. Halper, 590 F.2d 422 (2d Cir.1978); United States v. Long, 574 F.2d 761 (3rd Cir.), cert. denied, 439 U.S. 985 (1978); United States v. James, 555 F.2d 992 (D.C.Cir.1977).
 
 
 31
 Before evidence of other crimes is admissible, the court must find that: (1) the evidence is relevant to an issue other than the character of the defendant, such as identity, knowledge, plan or scheme; and (2) the probative value of the evidence outweighs the danger of unfair prejudice or confusion of issues. See United States v. Hatfield, 815 F.2d 1068, 1072 (6th Cir.1987) (before admitting evidence of other crimes, wrongs or acts, the district court must determine that the evidence is admissible for a proper purpose and that the probative value outweighs its potential prejudicial effects).
 
 
 32
 Whether the other crime, wrong, or act occurred before or after the events charged is generally not a factor to be considered by the court. United States v. Espinoza, 578 F.2d 224 (9th Cir.), cert. denied, 439 U.S. 849 (1978). The similarity between the events charged and the other crime, wrong or act also is not a key factor when the evidence is admitted to prove motive intent, plan or design. United States v. McPartlin, 595 F.2d 1321 (7th Cir.), cert. denied, 444 U.S. 833 (1979).
 
 
 33
 If similar acts evidence is offered, the prior crime, wrong, or act must be established by clear and convincing proof. Id. at 1344. There is, however, no requirement that the government prove that defendant was convicted of the prior crime or subsequent act. United States v. Hunter, 672 F.2d 815, 817 (10th Cir.1982).
 
 
 34
 We, therefore, conclude that the trial court properly admitted the evidence that witnesses observed defendants at the marijuana patches in Newaygo County and Lake City six days prior to their arrests. Such testimony was merely circumstantial evidence tying defendants to the marijuana fields and rebutted their claim of innocently blundering into the government's stakeout.
 
 D.
 
 35
 Defendants also claim that the charges against them should be dismissed because the provisions that allow a reduction in offense level for cooperation with the government violate the due process clause of the United States Constitution. Neither Bundy nor Mieras offered any cooperation with the government, therefore, they do not qualify for a reduction under 18 U.S.C. Sec. 3553(e) or U.S.S.G. Sec. 5K1.1. Finding the facts in this case insufficient to establish a "case and controversy" ripe for determination, the district court denied their motion.
 
 
 36
 The Sixth Circuit has determined that the downward departure afforded by U.S.S.G. Sec. 5K1.1 does not violate the constitutional right to due process. See United States v. Levy, 904 F.2d 1026, 1035 (6th Cir.1990). The Court reasoned that the prosecutor only has the power to move for departure. The decision whether to depart under section 5K1.1 lies with the district court. "[B]ecause defendants do not have a constitutional right to the benefit of downward departure under the Sentencing Guidelines, they cannot challenge the manner in which Congress has provided it." Levy, 904 F.2d at 1035.
 
 
 37
 As defendants failed to offer substantial assistance to the government, they fail to satisfy the case and controversy requirement. Even if they did establish a case and controversy, this Court has determined that their claims lack merit. We, therefore, conclude the district court's denial of their motion to dismiss based on the unconstitutionality of the 18 U.S.C. Sec. 3553(e) and U.S.S.G. Sec. 5K1.1 was proper.
 
 E.
 
 38
 The trial concluded on December 4, 1989. The jury commenced deliberations on December 5, 1989, at 9:00. During the course of deliberations, the jury asked several questions and sought further instructions. At 11:50 a.m., the jury presented a question to the district judge: "Does the manufacture of over 100 plants on federal land automatically constitute intent to distribute?" The court then reread to them the instructions regarding Count I of the indictment. After the instructions were read, the jury resumed their deliberations. The Assistant United States Attorney then brought to the court's attention the fact that the jury appeared to be confused by the combination of pleadings submitted in the conjunctive and proofs submitted in the disjunctive. The government's attorney then submitted case law regarding this issue and requested the court to instruct the jury along those lines.
 
 
 39
 After considering the issue, the district court stated the following:
 
 
 40
 So I see the point. The point is I've told them in a portion of one instruction manufacturing and distributing, and in the other instruction I've only said manufacturing. That's what's maybe part of the confusion here. So I think I've created it. Let me call the jury back in, preserving the defendants' objections to my bringing the jury back in, which for the record I believe is my responsibility sua sponte, the confusion being here.
 
 
 41
 Joint Appendix at 389 (Trial Transcript). The court then brought the jury back in and properly instructed them on pleadings in the conjunctive versus disjunctive. See United States v. Murph, 707 F.2d 895, 896 (6th Cir.1983) (An offense may be charged conjunctively in an indictment where the statute defines the offense disjunctively. The government may prove and the trial judge may instruct in the disjunctive form used in the statute.) After the jury returned to deliberate, the district court stated:
 
 
 42
 This court believing that it is incumbent upon the court to give the jury an accurate rendition of the law in this matter, believes that the necessity of giving this instruction over the defendants' objection is to potentially obviate the potential of the juror's misperception based upon some ambiguity in these two Devitt & Blackmer instructions and the statute and the indictment that the court has before it. This Court, of necessity, wishes to reemphasize that it is this Court sua sponte taking the action and not the parties, and only to correct an ambiguity.
 
 
 43
 Joint Appendix at 391 (Trial Transcript).
 
 
 44
 This Court has determined that it is the duty of the trial court to clear up uncertainties which the jury brings to the court's attention. See United States v. Giacalone, 588 F.2d 1158, 1166 (6th Cir.1978) (citing United States v. Rowan, 518 F.2d 685, 693 (6th Cir.), cert. denied, 423 U.S. 949 (1975)), cert. denied, 441 U.S. 944 (1979). The decision to supplement the jury instructions is committed to the sound discretion of the trial judge. This Court's review is limited to determining whether that discretion was abused. Id.; United States v. Nunez, 889 F.2d 1564, 1568 (6th Cir.1989). The supplemental instruction was a correct statement of the law. We find the trial court's actions well within this Circuit's standards for supplemental instructions; We, therefore, conclude that the district court exercised sound discretion.
 
 III
 
 45
 For the foregoing reasons, we AFFIRM the judgments of the
 
 
 46
 Honorable Robert Holmes Bell, United States
 
 District Judge for the Western District
 
 47
 of Michigan.
 
 
 
 *
 The Honorable William K. Thomas, United States District Judge for the Northern District of Ohio, sitting by designation