*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

>*Plaintiff-Appellee,*

>*v.*

ELIE F. ABBOUD (04-3942) and MICHEL ABBOUD
(04-3943),

>*Defendants-Appellants.*

Nos. 04-3942/3943

>

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-00236—John M. Manos, District Judge.

Argued: November 29, 2005

Decided and Filed: February 17, 2006

Before: SILER and CLAY, Circuit Judges; COOK, District Judge.[*]

---

## COUNSEL

**ARGUED:** David L. Doughten, Cleveland, Ohio, James R. Willis, Cleveland, Ohio, for Appellants. Matthew B. Kall, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** David L. Doughten, Cleveland, Ohio, James R. Willis, Cleveland, Ohio, for Appellants. Matthew B. Kall, Ann C. Rowland, ASSISTANT UNITED STATES ATTORNEYS, Cleveland, Ohio, for Appellee.

---

## OPINION

---

CLAY, Circuit Judge. Defendants Elie F. Abboud and Michel Abboud appeal the July 13, 2004 order of the United States District Court for the Northern District of Ohio convicting and sentencing Defendants for bank fraud in violation of 18 U.S.C. § 1344(1); money laundering in violation of 18 U.S.C. § 1957; conspiracy to commit money laundering in violation of 18 U.S.C. § 371; and failure to file income tax return in violation of 26 U.S.C. § 7203. Additionally, the order convicted and sentenced Defendant Michel Abboud for filing a false income tax return in violation

---

[*]The Honorable Julian A. Cook, Jr., United States District Judge for the Eastern District of Michigan, sitting by designation.

of 26 U.S.C. § 7206.  For the reasons set forth below, we **AFFIRM** the convictions on all counts, but we **VACATE** Defendants' sentences and **REMAND** to the district court for resentencing.

## I.  BACKGROUND

### A.   PROCEDURAL HISTORY

On June 14, 2002, a federal grand jury indicted Defendants Elie Abboud and Michel Abboud on twenty-seven counts of bank fraud, one count of conspiracy to commit bank fraud, forty-four counts of money laundering, and one count of conspiracy to commit money laundering.  On December 11, 2002, a federal grand jury returned a superseding indictment that added tax charges for both Defendants and firearm charges against Defendant Michel Abboud.  Specifically, the grand jury charged Defendant Elie Abboud with failure to file an income tax return in 1999 and 2000.  The grand jury charged Defendant Michel Abboud with filing a false tax return in 1999, and failure to file a tax return in 2000.

The district court granted Defendant Michel Abboud's motion to sever the firearm counts from the other counts.

Defendant Michel Abboud made a pretrial motion to suppress evidence seized from his home and his businesses.  On April 7, 2003, the district court denied Defendant's motion.  With respect to Defendant's request for an evidentiary hearing, the district court found that Defendant did not allege disputed issues of fact.  Instead, Defendant made "general conclusions" and arguments "entirely legal in nature." (J.A. at 235.)  The district court also found that the warrant was supported by sufficient probable cause for the crimes of bank fraud, money laundering, and tax violations.  The district court found that the warrant also met the particularity requirement with respect to the items to be seized.  The district court ruled that the warrant was not stale, as it described ongoing criminal activity.  With respect to seizure of items outside of the scope of the warrant, the district court reasoned that, from a practical perspective, law enforcement officers could not be expected to sift through all documents to exclude those outside the scope of the warrant, and that, in any case, the warrant was not general in nature.  With respect to Defendant's claim of omissions from the search warrant, the district court ruled that Defendant could not prove deliberateness or recklessness in connection with the omissions, and even if the omissions were included in the search warrant, probable cause would have still existed.

On September 5, 2003, the government made a motion *in limine* to prevent Defendants from presenting evidence of selective prosecution at trial.  The district court granted the motion.

On January 20, 2004, the government gave notice of its intent to offer Rule 404(b) evidence.  The district court admitted this evidence.

On February 17, 2004, the jury found Defendants guilty on all counts.  Defendants filed a motion for a judgment of acquittal, a motion for a new trial, and a motion for arrest of judgment.  On May 7, 2004, the district court denied these motions.

With respect to the motion for a judgment of acquittal, the district court first rejected Defendants' claim of multiplicity. Defendants' claim was that they were impermissibly indicted for each transaction of the bank fraud scheme.  The district court found that Defendants had waived the argument, as they had not made a proper pretrial motion.  In addition, the district court found that the argument was substantively incorrect, as the statute allowed separate counts for each transaction in the scheme.

The district court also found evidence sufficient to support the convictions of bank fraud, money laundering, and tax violations.  The district court rejected Defendants' argument that the

banks had allowed the practices at issue and that Defendants had acted in good faith. The district court found that the money laundering statute did not require concealment on the part of Defendants. The district court also found that Defendants failed to raise any issues with respect to the tax violations.

The district court further ruled that the introduction of Rule 404(b) "other acts" evidence without a limiting instruction did not require a judgment of acquittal.

The district court reaffirmed its position as to its decision to deny Defendant Michel Abboud's motion to suppress.

The district court rejected Defendants' contention that expert witness testimony was improperly admitted. The district court found that Defendants' arguments went to the weight and not to the admissibility of the evidence.

With respect to the motion for a new trial, the district court reaffirmed its decision to exclude Defendants' evidence that they were the target of selective prosecution. Specifically, Defendants alleged that they were targeted because of their Arab descent in the post-September 11 landscape. The district court found that Defendants did not make a selective prosecution claim via a pretrial motion, and that selective prosecution was not a matter for the jury.

With respect to the motion for arrest of judgment, the district court found that the government charged and proved Defendant Michel Abboud's guilt with respect to his filing of a false tax return.

On July 13, 2004, the district court sentenced each Defendant to ninety-seven months of imprisonment, three years of supervised release, and charged criminal monetary penalties. Defendants timely filed notices of appeal.

## B.    FACTS

### 1.    Defendants' Business Practices

Defendants are brothers who own various "corner stores" that sell groceries and money orders, and offer check cashing services.

Donald Slusher ("Slusher") worked for Defendants from 1994 to 1996. During his employment, Defendants would instruct Slusher to deposit checks from their accounts into other accounts controlled by them. Defendants controlled seven or eight bank accounts. Slusher deposited the checks into the various accounts in order to cover checks written the previous day from the accounts. In other words, Defendants would write a check from Account 1 on Day 1. Defendants would then have Slusher deposit a check from Account 2 on Day 2 into Account 1 to cover the check from Day 1. Defendants determined the check amounts and in which accounts to deposit which checks. Slusher believed that the practice was check kiting.[1] Slusher had access to

---

[1]    Check kiting is a systematic scheme to defraud, whereby nonsufficient checks are traded or cross deposited between two or more checking accounts in order to artificially inflate the bank account balances. This is accomplished by using the float time in the bank system. Once bank accounts are artificially inflated, checks that would normally be returned for nonsufficient funds are, in fact, paid or honored by the issuing banks.

(J.A. at 820-21.)

the check registers, and he found that the balances in the accounts were "very, very low." (J.A. at 536-37.)

Walter Ryder ("Ryder") also worked for Defendants, from 1990 or 1991 to 1999. When Slusher left in 1996, Ryder inherited Slusher's banking responsibilities. Defendants kept a separate book to track the true account balances versus the account balances shown by the banks, and Ryder was responsible for maintaining and informing Defendants of this difference. While the account balances given by the banks were usually positive, the actual balances tracked by Ryder were usually negative.

Defendants gave instructions to Ryder similar to those given to Slusher. For example, Ryder would "tell [Defendant Elie Abboud] what the balance at National City [Bank] was, what needed to be deposited, based on what was clearing that day, and I would ask what we should deposit that day." (J.A. at 555.) Defendant Elie Abboud would then tell Ryder to deposit a certain amount of money from Parkview Federal Bank ("PVF") accounts into the National City Bank ("NCB") accounts. Ryder would then deposit various forms of checks, such as customer checks, rent checks, and checks drawn from Defendants' other accounts into the PVF accounts.

Ryder was also responsible for maintaining "Elie's Special Report," which was a summary of the accounts in terms of bank balance, outstanding checks, and actual book balance. This report showed that although Defendants' accounts had positive bank balances, they had negative actual balances. For example, on September 1, 1998, the bank balance was positive $1.3 million, but the actual balance was negative $2.3 million.

In July of 1999, Defendants told Ryder that PVF had a policy change that disallowed Defendants from depositing PVF checks into PVF accounts. As a result, Defendants instructed Ryder to use accounts at other banks to make deposits into the PVF accounts.

### 2.    Policy of the Banks

Defendants had zero balance accounts in connection with a controlled disbursement system with NCB. The zero balance accounts entailed a system that had two types of accounts: a main account, and separate disbursement accounts. Defendants could write checks drawn from the disbursement accounts. In turn, the disbursement accounts would draw from the main account. If the main account was negative, then NCB would ask Defendants to cover the negative amount.

Defendants had zero balance accounts with PVF as well, although with a different system. Defendants had specific accounts with PVF for use with their check cashing business. The mechanics of such an account was that Defendants would deposit customer checks that they had cashed into an account on Day 1. PVF would then give "instant credit" to Defendants, so that they could withdraw the full amount of the checks deposited on Day 1, even though PVF had not received credit from those checks. On Day 2, PVF would find out which checks deposited were actually good and which were returned by the computer. As a result, a possibility existed that Defendants' account would be negative, if Defendants had withdrawn on Day 1 an amount that was greater than the actual amount credited on Day 2.

PVF allowed these accounts to become negative, because it had $500,000 in collateral from Defendants. If the account was negative, Defendants on Day 2 had to deposit funds sufficient to place the balance at zero.

PVF also charged a fee for the "instant credit" given to Defendants on Day 1. This was in connection with expenses in handling the accounts and for the time value of money.

Defendants also had zero balance accounts with Star Bank. The policy was similar to that of the NCB controlled disbursement system in that there was a main account and disbursements accounts. Defendants could have a negative balance on the main account, so long as they corrected the negative balance at the bank's request.

### 3.      Investigation by the Banks

Elizabeth Curschman ("Curschman") was an assistant compliance officer at PVF. On June 29, 1999, Curschman noticed that Defendants' accounts had checks being held for insufficient funds in the amount of $547,000. Curschman then noticed that Defendants paid funds into the account to cover these checks. Two days later, Curschman noticed two accounts where checks were being held for insufficient funds, also in large amounts. Curschman also noticed these checks were from one PVF account to another PVF account, so-called "on-us" checks. Curschman expressed her concern to John Schimmelman ("Schimmelman"), the checking account supervisor at PVF. The two then organized a meeting with Defendants to discuss the problem.

At the meeting, Schimmelman asked Defendant Elie Abboud to explain the heavy transactions for the accounts. Defendant Elie Abboud could not offer an explanation. Schimmelman noted that the actual negative balance on PVF accounts was approximately $1.5 million. Schimmelman instructed Defendants to separate their checks so that on-us checks would be processed directly against the accounts. Schimmelman stated that the transactions looked like check kiting, and if check kiting was occurring, it had to stop. Defendant Elie Abboud stated that he had not been involved in the business recently, and that he would look into the situation. Defendants also said that they had brought in money and would bring in more to cover the balance.

After this meeting, Curschman continued to monitor Defendants' accounts. Curschman reported that Defendants began to use checks from other banks to continue to cover the negative balances. In her opinion, the problem had not stopped.

Because of the continuing problem, John Male, president and CEO of PVF, held a meeting with Defendants in the beginning of September 1999. He told Defendants that he viewed the activity as check kiting, and the activity had to stop. The audit committee of PVF met twice to discuss the situation. Curschman noticed more check kiting activity on September 30, 1999.

On October 4, 1999, PVF officials held a meeting with Defendants. Defendants stated that they "had not presented an accurate picture of their finances" and needed an additional $1.8 million to cover the actual negative balances of the accounts. PVF officials decided to lock out Defendants' accounts. PVF also submitted a suspicious activity report ("SAR") to the FBI.

On October 7, 1999, James Muraco ("Muraco"), a NCB vice president, noticed an overdraft of almost $1.3 million on Defendants' accounts. Muraco set up a meeting with Defendants. Defendant Elie Abboud stated that he had just started to notice the shortage in the accounts two months prior. Muraco concluded that the overdraft was the result of "phony checks" being deposited into the NCB accounts. Muraco contacted Chris Feczko ("Feczko"), an NCB internal investigator, and told him about his suspicion that Defendants were engaged in check kiting. Feczko noticed several "red flags" that indicated check kiting, such as the cycling of checks between accounts.

On October 12, 1999, Muraco and Feczco held a meeting with Defendant Elie Abboud. The purpose of the meeting was to determine if there was an explanation for the activity, and to see if there was criminal activity occurring. At the meeting, Defendant Elie Abboud stated that the bookkeeping functions of the business had been entrusted to employees, and that he did not know how the situation had gotten out of hand. He also stated that he was the one who discovered the problem, and that he went to PVF to try to solve the problem. NCB also filed a SAR.

### 4.        Investigation by the FBI

After the FBI received SARs from PVF and NCB, the FBI began an investigation of Defendants.  The FBI subpoenaed bank records and analyzed those records using the Check Kiting Analysis Software ("CKAS").

Special Agent Randall Wolverton testified as an expert witness at Defendants' trial.  He testified as to the general nature of a check kiting scheme.  He testified that he had examined Defendants' records and the results of the CKAS analysis, and he found that Defendants had engaged in check kiting from June 1999 to August 1999.  He based this opinion on the disproportionate volume of checks written between Defendants' accounts in comparison with third party checks.  He also based his opinion on the disparity between Defendants' check transaction volume and Defendants' sales volume.  Finally, Wolverton based his opinion on the substantial differences between the bank balance and the actual balance of the accounts.

Special Agent David Morgan testified as to the "bleeding" of the kite, whereby Defendants would extract funds from the artificially inflated accounts.  He testified specifically with respect to the transactions from June 1999 to August 1999.  Defendants were making cash withdrawals, loan payments, and money order payments with the money from the check kite.

Defendant Elie Abboud stipulated that in 1999 and 2000 he had income in excess of the statutory threshold so that he was required to file a tax return for those years.

Defendant Michel Abboud stipulated that in 2000 he had income in excess of the statutory threshold so that he was required to file a tax return for that year.

The government presented evidence that Michel Abboud did not report gambling winnings on his income tax return for 1999.  The government also presented evidence that Defendant Michel Abboud did not report income from his businesses in that year.

## II.  DISCUSSION

## A.        THE DISTRICT COURT DID NOT ERR WHEN IT REJECTED DEFENDANTS' MULTIPLICITY CLAIM

### 1.        Preservation of the Issue

Under Federal Rule of Criminal Procedure 12(b)(2), a defense or objection "based on defects in the indictment or information," other than jurisdictional objections, must be raised by pretrial motion.  If a defendant does not make such a motion, the defense or objection is waived, but the court may grant relief from the waiver for cause.  Fed. R. Crim. P. 12(f).

A conflict exists in this Court's precedent on the issue of whether a defendant who does not raise a claim of multiplicity before trial waives the claim not only with respect to the error in the indictment but also to the error affecting substantive rights.  One line of cases has found that where a defendant fails to make a pretrial motion claiming multiplicity in the indictment, the defendant waives not only the claim based on the technical correctness of the indictment, but also the claim of multiplicity based on substantive rights, such as duplicative sentencing.  The seminal case for this line is *United States v. Woods*, 544 F.2d 242 (6th Cir. 1976).  There, the defendants argued that they had been incorrectly indicted *and convicted* of multiple counts of narcotics possession, when all of

the narcotics seized were at the same location and from the same shipment.**2**  *Id.* at 250-51.  The Court found that because the defendants had not made a pretrial objection to the indictment, their claims, including the claims of improper multiple sentences, were waived.  *Id.* at 251.  This view has been the more prevalent in the recent jurisprudence of this Court.  *See United States v. Hart*, 70 F.3d 854, 859-60 (6th Cir. 1995); *United States v. Colbert*, 977 F.2d 203, 208 (6th Cir. 1992) (finding waiver of the defendant's claim of improper multiple sentences for multiple counts of perjury).

Under the opposing line of cases, this Court has found that waiver of a claim of error of multiplicity in the indictment was not a waiver of a claim of error affecting substantive rights.  This line is rooted in *United States v. Rosenbarger*, 536 F.2d 715 (6th Cir. 1976).  The defendant in that case was a felon, and police found three guns in his home.  *Id.* at 718.  He was convicted for three counts of being a felon in possession of a firearm.  *Id.* at 717.  The Court vacated the convictions and sentences for two counts, because it found multiple gun possession amounted to only one violation of being a felon in possession of a firearm, unless the firearms were stored at different locations or acquired at different times.  *Id.* at 721.  The government argued that the defendant waived his multiplicity challenge by failing to make a pretrial motion.  *Id.*  The Court responded:

> The Government maintains that Fed. R. Crim. P. 12 should be applied in this case. Rule 12, provides, *inter alia*, that if the defense of multiplicity is not raised prior to trial, it is waived.  The argument that one waives his right to object to the imposition of multiple sentences by his failure to object to the multiplicitous nature of an indictment is a *non sequitur*.  Rule 12 applies *only to objections with regard to the error in the indictment itself*; the effect of Rule 12 is that dismissal of a multiplicitous indictment is not required; however, if sentences are imposed on each count of that multiplicitous indictment the defendant is not forced to serve the erroneous sentence because of any waiver.

*Id.* at 721-22 (emphasis supplied).  Although the defendant in *Rosenbarger* could not object to the indictment, he could object to the resulting substantive error of multiple sentences in violation of the Double Jeopardy Clause.  This view has been acknowledged by the Court, both in the multiplicity context, *see Moody v. United States*, 580 F.2d 238, 239 (6th Cir. 1978), and in the duplicity context, *see United States v. Adesida*, 129 F.3d 846, 849 (6th Cir. 1997) (holding that a defendant who fails to object to a duplicitous indictment, *i.e.*, an indictment that charges two crimes under the same count,  waives his challenge as to the technical error in the indictment but not to the substantive error with respect to his right to a unanimous jury verdict for each crime).

These two lines of cases directly conflict and cannot be reconciled.  Because this Court decided *Rosenbarger* before *Woods*, *Rosenbarger* controls.  *See Salmi v. Sec'y of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.").

The question then becomes whether Defendants made any substantive objections to the multiplicity in the indictment.  In both the motion for judgment on acquittal and the briefs before this Court, Defendants only object to the form of the indictment: "It is clear that rather than charge the Defendants in one count . . . the Government instead charged separate and distinct transactions as separate counts." (J.A. at 294.)  Defendants never claim violation of a substantive right, such as

---

**2**The indictment separated the narcotics counts by the varying strength of the narcotics in hydrochloride form. For example, Count 12 charged possession of cocaine hydrochloride with a strength of 15.8%, and Count 15 charged possession of cocaine hydrochloride with a strength of 32.7%.  *Id.* at 250 n.4

sentences in violation of double jeopardy.  As a result, Defendants waived their claim of multiplicity with respect to the indictment.

### 2.       Analysis

Even assuming Defendants did not waive the claim of multiplicity, the claim lacks merit. Section 1344 of Title 18 of the United States Code makes illegal each execution or attempted execution of bank fraud.  The circuits have been consistent in the determination that each check in a check kiting scheme is an execution or attempted execution, and thus each check may be charged in a separate count.  *United States v. Sirang*, 70 F.3d 588, 596 (11th Cir. 1995); *United States v. Schwartz*, 899 F.2d 243, 248 (3d Cir. 1990); and *United States v. Poliak*, 823 F.2d 371, 172 (9th Cir. 1987).  In an unpublished opinion, this Court affirmed that view.  *United States v. Lucas*, 68 F.3d 475, 1995 WL 598403, at *4-5 (6th Cir. Oct. 10, 1995) (unpublished decision).  We likewise find that each check in a check kiting scheme is an execution or attempted execution of bank fraud and may be charged in a separate count.

## B.       THE DISTRICT COURT DID NOT ERR IN DENYING DEFENDANT'S MOTION TO SUPPRESS

### 1.       Preservation of the Issue

Defendant Elie Abboud did not join Defendant Michel Abboud's motion to suppress.  A motion to suppress evidence must be made before trial.  Fed. R. Crim. P. 12(b)(3)(C).  If a defendant does not make such a motion, he waives the claim.  Fed. R. Crim. P. 12(f).  As a result, Defendant Elie Abboud waived his claim with respect to the evidence in question in Defendant Michel Abboud's motion to suppress.  Thus, we consider this claim only with respect to Defendant Michel Abboud.

### 2.       Standard of Review

When reviewing a district court's denial of a motion to suppress, the Court reviews factual findings for clear error and legal conclusions *de novo*.  *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004) (citing *United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999)).

### 3.       Analysis

#### a.       Incorporation of the Affidavit

The instant case presents a unique issue with respect to the incorporation of the affidavit into the search warrant.  The application for the search warrant in this case stated:

I David P. Morgan being duly sworn depose and say:

I am a Special Agent of the Federal Bureau of Investigation and have reason to believe that on the property of premises known as ATTACHMENT A

in the Northern District of Ohio there is now concealed a certain person or property, namely SEE ATTACHMENT B

which is

> Property that constitutes fruits, evidence, and instrumentalities of crimes against the United States, concerning violation of Title 18 United States code, Section 1344. The facts to support the finding of Probable Cause are as follows: See attached Affidavit hereby incorporated by reference as if fully restated herein.

(J.A. at 128.)  The face of the warrant application only listed one crime, violation of 18 U.S.C. § 1344, on which the search warrant was based.  The problem, however, is the affidavit incorporated to support the finding of probable cause for this single crime also listed additional offenses for which the affiant also found probable cause: violations of 18 U.S.C. §§ 341, 1343, 1956, 1957 and violations of 28 U.S.C. §§ 7201, 7203, 7206(1), 7206(2).

The question then becomes whether the warrant, in this specific form, was valid for a search for evidence of all of these crimes, as opposed to valid only with respect to evidence of a violation of 18 U.S.C. § 1344.  The district court answered in the affirmative: "[T]he affidavit, expressly incorporated by reference on the cover of the warrant, sets forth evidence of tax crimes up to the date of the search, as well as more recent bank fraud and mail and wire fraud violations."  In response, Defendant erroneously claims that the search warrant does not contain an incorporation clause at all. The government does not even address the issue of incorporation in its brief to this Court.

We disagree with the district court and find that the incorporation clause was insufficient to incorporate the additional violations into the search warrant, and, as a result, the search warrant was only valid for evidence with respect to 18 U.S.C. § 1344.  The Court's jurisprudence with respect to incorporation of an affidavit into a search warrant almost exclusively addresses the particularity or probable cause requirement of a search warrant.  *See, e.g.*, *United States v. Watkins*, 179 F.3d 489, 494 (6th Cir. 1999) (incorporation of an affidavit to provide sufficient particularity of place searched); and *United States v. Blakeny*, 942 F.2d 1001, 1024 (6th Cir. 1991) (incorporation of an affidavit to provide probable cause).  This Court has not addressed whether an affidavit incorporated for the purpose of supporting probable cause of a single violation may also be incorporated to establish probable cause for additional violations not listed on the face of the warrant but for which the affiant professes probable cause.[3]  Despite the lack of directly controlling case law, several factors militate in favor of disallowing such a broad incorporation of the affidavit.

The natural reading of the search warrant is that the affidavit was incorporated only to show probable cause for violation of 18 U.S.C. § 1344.  There is absolutely no indication on the face of the warrant that the affidavit was incorporated to show probable cause for the additional violations. We could foresee an incorporation clause that would have such effect; for example, if the face of the warrant stated, "See attached Affidavit hereby incorporated for the violations and underlying probable cause that constitute the basis of the search warrant."  The search warrant in this case, however, only states:

> Property that constitutes fruits, evidence, and instrumentalities of crimes against the United States, concerning violation of Title 18 United States code, Section 1344. The facts to support the finding of Probable Cause are as follows: See attached Affidavit hereby incorporated by reference as if fully restated herein.

(J.A. at 128.)  The affidavit is only referenced to establish probable cause for a violation of 18 U.S.C. § 1344.

More importantly, this Court cannot determine whether the magistrate in this case found probable cause for all of the violations listed in the affidavit or for only the violation listed on the

---

[3]The dearth of case law on this point in all likelihood stems from the fact that law enforcement officers customarily list on the face of the search warrant all of the violations for which they seek evidence.

face of the warrant.  The government bears the burden of showing probable cause in connection with a search warrant.  Fed. R. Crim. P 41(c); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996).  Only if the magistrate finds probable cause can she issue a search warrant.  Fed. R. Crim. P. 41(c); *Weaver*, 99 F.3d at 1377.  In this case, the only certainty is that the magistrate found probable cause with respect to the violation of 18 U.S.C. § 1344.[4]

Three possible scenarios exist as to the magistrate's treatment of the additional violations listed in the affidavit.  Under scenario one, the magistrate reviewed the additional violations listed in the affidavit but not on the face of the warrant and found that the government had shown probable cause for each of the additional violations.  She then either felt that the incorporation clause was sufficient to incorporate these additional violations or she failed to recognize that the additional violations were not listed on the face of the warrant.  Under scenario two, the magistrate reviewed the additional violations and found that the government had not shown probable cause for any of the additional violations but had shown probable cause for violation of 18 U.S.C. § 1344.  She then noticed that the face of the warrant only listed that violation, and that the incorporation clause only pertained to the probable cause for that violation.  She signed the warrant, believing that the basis of the warrant was solely the violation of 18 U.S.C. § 1344.  Under scenario three, the magistrate did not review the additional violations and the asserted probable cause in the affidavit because the face of the warrant only listed 18 U.S.C. § 1344.

We cannot say that one scenario is more likely than the others.  The government may argue that Attachment B, listing items to be seized, indicates that the magistrate found probable cause with respect to the other violations; for example, the list includes "[c]opies of all tax returns prepared on behalf of the above mentioned businesses and individuals,"  (J.A. at 119), so that the list evidences that the magistrate found probable cause with respect to the tax violations.  This item, however, can also be construed as evidence of a violation of 18 U.S.C. § 1344, bank fraud.  In other words, the government sought these income tax returns not to show the individual Defendants violated income tax laws, but to show disparities between paper and actual wealth as evidence of the check kiting scheme.  In fact, all of the evidence of these additional crimes could also be construed as evidence of bank fraud.

The point is that we can only speculate as to whether the magistrate found probable cause with respect to the additional violations listed in the affidavit.  This Court will not uphold a search warrant based on such tenuous ground.

We are sympathetic to the argument that, in practical terms, Defendant was on notice of the additional violations and the evidence for these additional violations overlapped with the evidence of the violation of 18 U.S.C. § 1344.  This argument, however, misses the point in that notice of evidence to be seized does not cure a lack of a probable cause determination.

We also recognize that the exclusionary rule is meant to deter police misconduct: "[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges."  *Illinois v. Gates*, 462 U.S. 213, 263 (1983) (White, J., concurring in the judgment).  The government may argue that the magistrate erred when she did not clearly state for which violations she had found probable cause.  We are more inclined to view the case as one of applicant error; the applicant simply forgot or otherwise failed to list the additional violations on the face of the warrant.  As the party seeking the search warrant, the applicant maintains the responsibility of clearly setting out the violations for which he is searching for evidence.

---

[4]Of course, a possibility exists that the magistrate "rubber stamped" the warrant, in which case the entire warrant would be invalid.  *United States v. Frazier*, 423 F.3d 526, 537 (6th Cir. 2005).  Defendant, however, has the burden to show such misconduct, *United States v. Rodriguez-Suazo*, 346 F.3d 637, 649 (6th Cir. 2003), and he has not produced any such evidence.

Specifically listing the additional violations on the face of the warrant would have required a minimal effort, and the resulting clarity would have made such effort worthwhile.

Moreover, while the record does not indicate any misconduct on the part of law enforcement in this case, a less than imaginative mind could conjure a scenario where law enforcement purposely placed hidden violations in the affidavit in order to bootstrap these violations to the magistrate's probable cause determination. A better rule would be to require the applicant to list the violations on the face of the search warrant or, if incorporating an affidavit, to require the applicant to make clear with the incorporation clause on the face of the application that the affidavit contains the relevant violations.

As a result, we find that the magistrate approved the search warrant only with respect to the violation of 18 U.S.C. § 1344.[5]

### b.      Probable Cause

The Fourth Amendment requires probable cause for searches and seizures. U.S. Const. amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.'" *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal quotations and citation omitted). Probable cause is based on the totality of the circumstances; it is a "practical, non-technical conception that deals with the factual and practical considerations of everyday life." *Id.* (internal quotations and citation omitted). When reviewing probable cause, the Court may only look within the four corners of the affidavit. *Id.* (citation omitted). Additionally, the Court should give great deference to a magistrate's determination of probable cause. *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)) (en banc).

### i.      The Violation

Because we find that the magistrate approved the warrant only with respect to bank fraud, we will limit our probable cause analysis to that violation. The affidavit stated more than sufficient probable cause for the charge of bank fraud in 1999. The FBI conducted a check kiting analysis for a three-month period in 1999. The analysis revealed that during the three months, Defendants made $300 million in deposits to their various accounts, and 85% of these deposits were kited funds. This analysis demonstrates probable cause for check kiting violations in 1999.

On the other hand, the affidavit does not establish probable cause for bank fraud via check kiting in subsequent years.[6] The affidavit lists the following evidence:

---

[5]We will proceed with the following caveat: although the warrant was not approved for the independent search of evidence for the additional violations, it does not follow that all evidence of these additional violations found during the search must be suppressed. As stated, *supra*, an overlap exists between evidence lawfully obtained through a search based on violation of 18 U.S.C. § 1344 and evidence of the additional violations. We will explain the ultimate consequences below.

[6]We recognize that the indictment only charged the defendants with bank fraud with respect to the three-month period in 1999. This fact, however, is irrelevant as to whether the affidavit stated probable cause for seizure of evidence of bank fraud outside of this period.

(1)     In 2000, Metropolitan Bank filed a Suspicious Activity Report ("SAR") concerning Defendants' accounts.

(2)     In March 2001, Curschman noted suspicious activity with respect to Defendants' accounts.

(3)     In July 2001, a security officer at FirstMerit Bank became suspicious of activity in Michel Abboud's account.

(4)     In January 2002, Curschman discovered Michel Abboud was using a bank account in violation of previously established guidelines.

(5)     In April 2002, PVF filed a SAR concerning Defendants' accounts.

(6)     In May 2002, Merchant Express Money Order ("MEMO") severed its relationship with Defendant Elie Abboud, and MEMO incurred a loss.

Even when considered cumulatively, the above-referenced evidence does not meet the threshold of probable cause. Most of the evidence recites a third party's suspicion of criminal activity on Defendants' part. This evidence by its nature does not rise above mere suspicion insufficient to sustain a finding of probable cause.

### ii.     Nexus with the Location Searched

The probable cause inquiry of whether an individual committed a crime is related but distinct from the probable cause inquiry for a search warrant. *Blakeney*, 942 F.2d at 1025. "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *Frazier*, 423 F.3d at 531. Defendant's argument that there was no nexus between the locations searched, his home and his businesses, and the evidence sought is without merit. One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home. Likewise, personal financial records are also usually stored at a person's home or place of business.

Defendant's claim that these were conclusory statements based on the affiant's "meager experience" misses the mark; the affiant is a seasoned FBI Special Agent whose primary concentration is in financial crimes. Certainly his insight as to the probable location of the evidence of the crimes in this case cannot be denigrated as "pathetic averments," as Defendant so states. (Michel Abboud Def.'s Br. 14.) Quite the contrary, the magistrate correctly relied on the affiant's experience in his assessment of the probable location of the evidence.

### c.     Staleness

The probable cause required for a search warrant "'is concerned with facts relating to a presently existing condition.'" *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (quoting W. LaFave, Search and Seizure § 3.7 at 338 (3d ed. 1996)). "Thus, the critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at [the location of the search]." *Id.* In other words, a warrant is stale if the probable cause, while sufficient at some point in the past, is now insufficient as to evidence at a specific location.

The staleness inquiry is tailored to the specific circumstances in each case. *Id.* (citing *Sgro v. United States*, 287 U.S. 206, 210-11 (1932)). "[T]he length of time between the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling." *Id.* It is

possible that even if a substantial amount of time had elapsed between "a defendant's last reported criminal activity" and the issuance of the warrant, the warrant had not become stale. *Id.*

This Court has outlined several factors to consider when analyzing staleness:

(1) "the character of the crime (chance encounter in the night or regenerating conspiracy?)"

(2) "the criminal (nomadic or entrenched?)"

(3) "the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?)"

(4) "the place to be searched (mere criminal forum of convenience or secure operational base?)."

*Id.* (quoting *Andresen v. State*, 331 A.2d 78, 106 (Md. Ct. Spec. App. 1975)).

As explained above, the affidavit set forth sufficient probable cause with respect to bank fraud in 1999 but not with respect to any subsequent year. The question then becomes whether this probable cause had become stale, as the magistrate issued the warrant in 2002. By applying the factors listed above, we find that the probable cause was not stale when the magistrate issued the warrant.

### i.      The Character of the Crime

The bank fraud alleged in the affidavit was not a one-time occurrence but was rather a systematic transfer of funds between accounts held by Defendants. According to the FBI analysis for the period of June 1, 1999 to August 31, 1999, Defendant Michel Abboud alone was the signer of 1,276 checks involved in the check kite, with a total value of about $89 million.

The Court has found that "[e]vidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001). In *Greene*, the magistrate issued a search warrant on January 8, 1999. *Id.* at 475. The search warrant was based on information supplied by an informant, who had last purchased narcotics at the defendant's house in February 1997; however, he had purchased narcotics at least twelve times at the defendant's house. *Id.* at 476. The Court found that the continuous and ongoing nature of the illegal activity was a sufficient answer to the defendant's claim of staleness. *Id.* at 481.

Likewise, in this case, the affidavit stated that Defendant Michel Abboud engaged in bank fraud numerous times during a three-month period in 1999. While the affidavit did not list sufficient probable cause for any time after 1999, so as to establish a continuous criminal enterprise from 1999 to the issuance of the warrant in 2002, this Court's jurisprudence suggests that ongoing criminal activity *at a given time* may be sufficient to defeat a claim of staleness. *See id.* at 481; *see also United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995) (finding ongoing activity at the defendant's house four years prior to the issuance of the search warrant was sufficient to defeat a claim of staleness).

### ii.      The Criminal

The affidavit supported the fact that Defendant was entrenched. Defendant owned multiple convenience stores in the Cleveland area. Defendant owned a home in the area. There was no indication that Defendant moved from place to place, so as to decrease the probability of finding evidence at a given location.

### iii.    The Thing to be Seized

The search warrant sought almost exclusively business and personal financial records from Defendant. This Court has found that old business records could reasonably be expected to be found at the defendant's home or place of business. *United States v. McManus*, 719 F.2d 1395, 1400-01 (6th Cir. 1983). In *McManus*, the magistrate issued a search warrant on January 7, 1980 in connection with tax violations for the years 1977, 1978, and 1979. In finding that the warrant was not stale, the Court stated, "It certainly would be reasonable for a magistrate to conclude that on January 7, 1980, defendant's business records for the years 1977, 1978, and 1979 would be found at either his place of business or his residence. . . . '[Business records] are . . . the sort *which could be reasonably expected to be kept there for long periods of time.*'" *Id.* at 1401 (quoting *United States v. Freeman*, 685 F.2d 942, 952 (5th Cir. 1982)).

This Court has found that business records are a type of evidence that defy claims of staleness. *See United States v. Word*, 806 F.2d 658, 662 (6th Cir. 1986); *United States v. Brownderville*, No. 98-1374, 1999 WL 618067, at *4 (6th Cir. Aug. 2, 1999); *see also United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004); *United States v. Farmer*, 370 F.3d 435, 439-40 (4th Cir. 2004); *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 148 (3d Cir. 2002).

We agree that in this case, the magistrate was correct in believing that business and financial records with respect to 1999 would still be at Defendant's home or businesses in 2002. As the Third Circuit viewed the situation, "where the items to be seized are created for the purpose of preservation, as are business records, the passage of time is . . . less significant." *Id.*

### iv.    The Place to be Searched

The affidavit requested the search of Defendant's home and businesses. The bank fraud alleged centered around Defendant's check cashing transactions conducted at these business locations. Furthermore, the affiant stated that business records were usually kept at home. These locations are not "mere criminal forum[s] of convenience;" but rather, the locations are at the heart of the criminal charge.

### v.    Conclusion

All factors weigh against a claim of staleness. We are especially persuaded by the fact that by nature one keeps business and financial records for extended periods of time. The entire point in creating such records is for preservation. As a result, the warrant was not stale.

### d.    Omission of Material Facts

Defendant claims the affiant omitted material facts from the affidavit, thus skewing the magistrate's probable cause calculus. We disagree.

In *Franks v. Delaware*, the Supreme Court created procedural protections for a defendant who claimed that the affidavit supporting the probable cause of a search warrant contained intentional or reckless falsehoods. The Court stated that it presumed the validity of the affidavit in support of the search warrant. 438 U.S. 154, 171 (1978). The burden is on the defendant to show such falsehoods in the affidavit. *Id.* If the defendant meets this burden, then the question becomes whether the affidavit is sufficient to support probable cause without the falsehoods. *Id.* If it is sufficient, then the warrant is valid. *Id.* at 171-72. If it is insufficient, then the defendant is entitled to a hearing concerning the probable cause in the affidavit. *Id.* at 172. This Court has interpreted *Franks* to include omissions. *Hale v. Kart*, 396 F.3d 721, 726 n.4 (6th Cir. 2005) (citing *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998)).

Defendant claims three omissions: (1) PVF had not lost the millions of dollars as claimed in the affidavit; (2) Defendants' accounts were fully collaterized; and (3) the banks involved knew of and approved of Defendants' actions.

We agree with the government that the evidence contained in (1) and (2) was not omitted in the affidavit. With respect to (1), paragraphs 20-23 of the affidavit detailed transfers made by Defendants to cover the negative balances in their checking accounts. With respect to (2), paragraph 17 of the affidavit stated that PVF had a positive equity position against Defendants' collaterized real estate and that PVF also held $500,000 of stock belonging to Defendants.

We agree with Defendant that the affidavit did not state that the banks involved knew of and approved of Defendant's actions with respect to the check kiting system. As explained, *infra*, however, we disagree with Defendant's contention that the banks in fact approved of the check kiting scheme. As a result, no harm occurred from this fact's omission from the affidavit, and Defendant was not entitled to a *Franks* hearing.

### e.    Particularity

The Fourth Amendment requires that a search warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This requirement prevents a "'general order to explore and rummage through a person's belongings.'" *Blakeney*, 942 F.2d at 1026 (quoting *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981)). "The degree of specificity required depends on the crime involved and the types of items sought." *Id.* (citing *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988)).

In this case, law enforcement sought business and financial records in connection with bank fraud. In a business fraud case, the authorization to search for general business records is not overbroad. *United States v. Henson* is instructive in this regard. There, the defendants were charged and convicted of mail fraud and giving, or causing to give, a false odometer statement. 848 F.2d at 1376. The defendants were involved in a scheme of purchasing late model, high mileage cars and then tampering with the odometers. *Id.* The search warrant authorized the search for "any and all records" in connection with the businesses utilized in the scheme, as well as the records of the individual defendants. *Id.* at 1382.

This Court upheld the validity of the warrant:

> In the instant case, although the warrant uses generic terms, [the law enforcement officer] could not have known at the time he applied for the warrant what precise records and files would contain information concerning the odometer-tampering scheme. "Where the precise identity of the goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice." The description in the warrant is directed toward items likely to provide information concerning the [defendants] involvement in the . . . scheme and therefore did not authorize the officers to seize more than what was reasonable under the circumstances.

*Id.* at 1383 (citation omitted). In this case, the warrant was specific in terms of the items to be seized; for example, it listed "[l]ogs or ledgers that reflect the recording of banking activity," "[a]ll bank statements, deposit slips, withdrawal slips, official checks, money orders, cancelled checks, wire transfers and other documents for any and all bank accounts," and other specific forms of records. (J.A. at 118-21.) Moreover, like in *Henson*, the law enforcement agents in this case could not have known the precise documents and records Defendants utilized in the check kiting scheme. The items listed in the warrant were items "likely to provide information" about Defendants' check

kiting scheme.  A more specific alternative did not exist to the search warrant's list of items to be seized.

The problem, however, is the time frame the warrant allowed with respect to these records. The warrant authorized search for records from January 1996 to May of 2002; however, the warrant was valid only with respect to bank fraud for a three-month period in 1999, *see supra*.  The only reference to 1996 in the affidavit is the fact that Defendants first began a relationship with the head teller at PVF's Rockside branch in that year, a trivial fact.  The first documented suspicion began on June 29, 1999.  The FBI conducted a check kiting analysis for a three-month period in 1999.  As stated, *supra*, insufficient evidence is listed in the affidavit to support probable cause for any subsequent years.

The warrant was overbroad in this respect.  "Failure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad."  *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999) (citations omitted).  Here, law enforcement knew that the evidence in support of probable cause in the affidavit revolved only around a three-month period in 1999; the authorization to search for evidence irrelevant to that time frame could well be described as "rummaging."[7]

The question then becomes what relief Defendant is entitled to from this overbroad warrant. The Court has held that the entire warrant need not be invalidated: "Our finding of overbreadth . . . does not require suppression of all of the items seized pursuant to the warrant.  We believe the proper approach to this dilemma is to sever the infirm portion of the search warrant from the remainder which passes constitutional muster."  *Blakeney*, 942 F.2d at 1027.  Thus, all evidence seized irrelevant to the three-month period in 1999 should have been suppressed, while evidence relevant to this period should be upheld.

Defendant's problem, however, is that he was only charged with and convicted of bank fraud for the three-month period in 1999.  As a result, Defendant cannot show prejudice from the overbreadth of the warrant.  The properly seized evidence, along with the government's evidence from other sources, proved beyond a reasonable doubt that Defendant had committed bank fraud for the three-month period in 1999.  Of most significance, Defendant never denied committing the acts that constituted the bank fraud; his defense was that the bank officials allowed the acts in question and that his actions were in good faith.  *See infra*.  This defense was not negated by the introduction of the illegally seized evidence, but instead was negated only by the testimony of the bank officials. As a result, the introduction of evidence seized pursuant to the overbroad portion of the warrant was harmless error.

### f.       Reexamination of the Motion to Suppress

Defendant urges this Court to reexamine the district court's decision on the motion to suppress.  His argument is based on his perceived inconsistency between the affidavit and the affiant's testimony at trial, and testimony at trial that contradicted the affidavit.

We disagree with Defendant that the affiant's testimony at trial contradicted the affidavit. In his testimony, the affiant expressly affirmed what he stated in the affidavit; he testified that when he spoke to the magistrate, he stated that he believed or concluded that certain bank officials intentionally withheld information, and that one bank official devised a scheme to recoup the losses

---

[7]We do not find that the search warrant was only valid for records from June, July, and August of 1999.  A degree of flexibility is required, because evidence that dated from outside of the time period may be relevant to the activity within the time period.  For example, evidence of continued check kiting in September and October in 1999 after warnings from bank officials would be evidence of bad faith; however, evidence from 1996 or 2002 is clearly irrelevant.

of Defendants' scheme without informing the FBI of any losses.  The affiant later testified that charges were not brought against these bank officials.

The cogency of Defendant's argument is somewhat suspect; Defendant seems to be asserting that because charges were not brought against the bank officials, the affiant was less than forthright in his statements to the magistrate that the bank officials were withholding information from the FBI.  If this is the case, then Defendant's argument fails; the fact that the bank officials were not prosecuted does not necessarily mean that the affiant lied to the magistrate when he stated that he suspected dishonesty on the part of the bank officials.  In fact, Defendant's own cross-examination insinuated that these charges were not brought because of the bank officials' cooperation with Defendant's prosecution, not because the charges were baseless.

Defendant then relies on the trial testimony of Keith Swaney, an officer at PVF, where Swaney stated that he disagreed with the affiant's statement in the affidavit that the bank officials intentionally withheld information from the FBI.  Again, Defendant seems to argue that the affiant lied to the magistrate.  As explained above, to obtain a *Franks* hearing, Defendant has the burden to prove the falsehoods made in the affidavit.  The mere fact that a bank official disagreed with the affidavit is insufficient to meet this burden.

### g.    Evidentiary Hearing

Defendant challenges the district court's refusal to hold an evidentiary hearing in connection with the motion to suppress.  The district court based its decision on the fact that Defendant's arguments were "entirely legal in nature," and thus did not require a hearing.

The district court's decision was correct.  An evidentiary hearing is required "only if the motion is sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that *contested issues of fact* going to the validity of the search are in question." *United States v. Downs*, No. 96-3862, 1999 WL 130786, at *3 (6th Cir. Jan. 19, 1999) (citing *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993)) (emphasis supplied).

In his brief in support of his motion to suppress, Defendant for the most part did not contest factual issues; he contested the legal conclusions drawn by the magistrate from the facts.  Under subpoint I, Defendant argued that the facts were insufficient to support probable cause; this contests a legal conclusion.  Under subpoint II, Defendant argued that the affidavit omitted material information; however, as explained, *supra*, this argument was simply incorrect and did not require an evidentiary hearing.  Under subpoint III, Defendant argued that the probable cause was stale; this too was a challenge to a legal conclusion.  Under subpoints IV, V, and VI, Defendant argued that the warrant was overbroad, another legal challenge.  Defendant did not contest any facts, nor did he offer previously unheard facts.  Simply put, Defendant did not agree with the magistrate's legal decision based on the facts.  This type of disagreement is not resolved through an evidentiary hearing.  As a result, the district court did not err in its decision not to grant an evidentiary hearing.

### h.    Good Faith Execution of a Search Warrant

Even if a search warrant is defective, the Court will not suppress evidence seized pursuant to such warrant if the seizure was based on reasonable, good faith reliance on the warrant. *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) (citing *United States v. Leon*, 468 U.S. 897, 905 (1984)).  The Supreme Court explained the mechanics of the good faith exception:

> [O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the

circumstances--including whether the warrant application had previously been rejected by a different magistrate--may be considered.

*Leon*, 468 U.S. at 922-23 n.23.  The rationale behind the exception is that the exclusionary rule is meant to deter unlawful police conduct.  *See supra*.  This policy of deterrence is not served by the exclusion of evidence seized in good faith by the police.  *Leon*, 468 U.S. at 918-19.

On the other hand, the good faith exception does not apply in the following specific circumstances: "1) the supporting affidavit contained knowing or reckless falsity; 2) the issuing magistrate wholly abandoned his or her judicial role; 3) the affidavit is 'so lacking in probable cause as to render official belief in its existence entirely unreasonable;' or 4) where the officer's reliance on the warrant was neither in good faith nor objectively reasonable."  *Frazier*, 423 F.3d at 533 (quoting *Leon*, 468 U.S. at 923).

With respect to the additional violations contained in the affidavit but not on the face of the warrant, a police officer could not reasonably rely on the affidavit to validate a search for evidence of these additional violations.  The natural reading of the face of the warrant was that the affidavit was incorporated only for the purpose of establishing probable cause for bank fraud.  Moreover, the warrant was unclear as to whether the magistrate did indeed find probable cause for these additional violations.  Law enforcement may not take advantage of the warrant's equivocal posture to illegally seize evidence.

With respect to bank fraud in any year besides 1999, the affidavit's lack of probable cause was obvious to the reasonably trained officer.  The affidavit only listed suspicions of check kiting in these other years.

### i.    Prejudice

The ultimate question then becomes what harm Defendant has suffered from the illegality of the warrant.  The record is less than clear as to what evidence seized through the warrant was actually used at Defendant's trial.  *See Blakeney*, 942 F.2d 1027 (holding that the defendant did not suffer prejudice when the evidence illegally seized was not introduced at trial).  For purposes of this analysis, we will presume the widest use of the illegal evidence.

As stated earlier, the warrant was only valid with respect to bank fraud, and only bank fraud in 1999.  This means that evidence with respect to the year 2000 should have been suppressed, possibly implicating Defendant's conviction for violation of 26 U.S.C. § 7203, failure to file an income tax return in 2000.  Unfortunately for Defendant, he stipulated to the fact that he did in fact make the threshold amount triggering the requirement to file a tax return.  His only defense was lack of intent, which was negated by the government without use of any evidence seized via the overbroad search warrant.  *See infra.*  As a result, the admission of any of this illegal evidence would have been harmless error with respect to Defendant's conviction for this charge.

Also, with respect to Defendant's conviction for violation of 26 U.S.C. § 7206, filing a false income tax return in 1999, the conviction rested on two forms of evidence: (1) evidence of a failure to report gambling income, and (2) evidence of a failure to report income from his businesses.  The evidence listed in (1) was not seized pursuant to the warrant, and the evidence seized in (2) could properly be characterized as evidence of bank fraud legally obtained under the warrant.

The evidence seized with respect to the 1999 bank fraud charges was valid; therefore, the Court affirms these convictions.  Furthermore, the evidence for the 1999 money laundering charges completely overlapped with the evidence for the 1999 bank fraud charges.  The evidence of transfers in the amount of $10,000 or more for the relevant period show both the "bleeding" of the check kite, which is relevant evidence to the charges of bank fraud, and money laundering in violation of 18

U.S.C. § 1957.  Because the jury only considered legally obtained evidence with respect to money laundering, the convictions stand.  Likewise, the evidence of bank fraud and conspiracy to commit money laundering completely overlap, and this conviction stands.

**C.     WHETHER THE DISTRICT COURT ERRED IN GRANTING THE GOVERNMENT'S MOTION *IN LIMINE* THAT PREVENTED DEFENDANTS FROM PRESENTING EVIDENCE OF SELECTIVE PROSECUTION**

### 1.     Preservation of the Issue

Federal Rule of Criminal Procedure 12(b)(1) requires that "[d]efenses and objections based on defects in the institution of the prosecution" must be raised by a pretrial motion.  Rule 12(f) states that failure to make such a pretrial motion results in waiver of the defense or objection; however, the Court may grant relief from the waiver for cause.  Fed. R. Crim. P. 12(f).

Here, Defendants did not make a 12(b)(1) motion based on selective prosecution before trial and thus waived the issue.  Therefore, the district court did not err in preventing Defendants from presenting evidence of this waived defense at trial.

### 2.     Standard of Review

This Court reviews the district court's evidentiary rulings for an abuse of discretion.  *United States v. Taplin*, 954 F.2d 1256, 1258 (6th Cir. 1992) (citation omitted).

### 3.     Analysis

As stated above, Defendants waived the defense of selective prosecution.  Independent of the waiver, the district court's motion *in limine* was correct because the defense of selective prosecution is a matter that is independent of a defendant's guilt or innocence, so it is not a matter for the jury.  As the Third Circuit stated:

> By both tradition and constitutional mandate the jury is given the responsibility of determining guilt or innocence according to instructions of law delivered by the court.  The question of discriminatory prosecution relates not to the guilt or innocence of appellants, but rather addresses itself to a constitutional defect in the institution of the prosecution.

*United States v. Berrigan*, 482 F.2d 171, 175 (3d Cir. 1973).  Thus, a "defense" of selective prosecution is a matter for the court, not the jury.

We wholeheartedly agree with Defendants' argument that cross-examination plays a vital role in the adversarial system of our country, and the ability to show bias, motive, or prejudice on the part of a witness is an integral part of cross-examination.  Defendants, however, seem to conflate the concepts of witness bias and selective prosecution.  Witness bias speaks to "'the reliability of the witness.'"  *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1984) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).  When one exposes bias, motive, or prejudice of a witness, one is calling into question the credibility of that witness' testimony.  Selective prosecution is a separate and distinct claim that the defendant has been unconstitutionally selected for prosecution.

Defendants made clear in the memorandum in opposition of the motion *in limine* that the cross-examination sought was to establish selective prosecution:

> In fact, Defendant's goal sought from the full cross-examination of the witnesses is to support his defense that, for a number of years he had conducted his business

activities with bank direction and approval and without governmental interference or objection; that, prior to September 11, 2001, the SAR of November, 1999, led to no criminal prosecution; and, that subsequent to September 11, 2001, the Government, in violation of Defendant's constitutional rights, initiated the instant matter as a result of Defendant's ethnicity.

(J.A. at 262.) Surprisingly, Defendants fully admitted that the purpose of the cross-examination was not to test the reliability of the witnesses, but instead to present a defense of selective prosecution. As stated earlier, selective prosecution is not an issue for the jury, so the district court correctly granted the motion *in limine*.

### D.    WHETHER THE DISTRICT COURT ERRED IN ITS TREATMENT OF 404(b) EVIDENCE THAT DEFENDANTS PAID EMPLOYEES "UNDER THE TABLE"

#### 1.    Standard of Review

This Court reviews the district court's legal determination that the evidence was admissible for a legitimate purpose *de novo*. *United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir. 1996) (citing *United States v. Johnson*, 27 F.3d 1186, 1190 (6th Cir. 1994)). The Court reviews the district court's determination that the probative value was not substantially outweighed by the unfairly prejudicial effect for abuse of discretion. *Id.*

#### 2.    Analysis

The district court did not err when it admitted evidence that Defendants paid employees under the table.

#### a.    Legal Framework

Federal Rule of Evidence 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Moreover, even if the "other acts" evidence is relevant, if the probative value is substantially outweighed by its unfair prejudice, the district court may exclude the evidence. Fed. R. Evid. 403.

This Court has outlined a four-step process for the admission of Rule 404(b) evidence. First, the proponent of the evidence must identify the specific purpose of the "other acts" evidence. *Merriweather*, 78 F.3d at 1076. Second, the district court must decide whether the identified purpose is at issue in the case. *Id.* at 1076-77. Third, if the purpose is at issue, the district court must weigh the probative value against the danger of unfair prejudice. *Id.* at 1077. Finally, if the district court admits the evidence, it must then clearly instruct the jury as to the specific purpose for which the jury may consider the evidence. *Id.*

### b.        The Evidence Presented

The government offered the testimony of two employees of Defendants.  They testified that they received their wages in the form of legitimate checks and cash, as "under the table" payments.

### c.        Application to This Case

#### i.        Purpose

The government's purpose in offering evidence that Defendants paid employees "under the table" was to show willfulness, motive, and absence of mistake.

#### ii.        Whether the Purpose was in Issue

The violations of failing to file a tax return and filing a false tax return require strict willful conduct.  *See* 26 U.S.C. §§ 7203, 7206.  As explained by this Court:

> The word "willfully," as used in this statute, means a voluntary, intentional violation of a *known legal duty*.  In other words, the defendant must have acted voluntarily and intentionally and with the specific intent to do something he knew the law prohibited, that is to say, with intent either to disobey or to disregard the law.  Negligent conduct is not sufficient to constitute willfulness.

*United States v. Tarwater*, 308 F.3d 494, 510 (6th Cir. 2002) (emphasis supplied).  Because of the complexity of the tax system, tax law is one of the few areas where the Supreme Court has held that ignorance of the law is a defense.  *Cheek v. United States*, 498 U.S. 192, 199-200 (1991).  If the defendant has a good faith belief that he was not violating tax law, the defendant cannot be found guilty of a tax violation, even if the good faith belief is unreasonable.  *Id.* at 202.

In this case, willfulness and absence of mistake were in issue with respect to the tax violations.  During pretrial discussions, Defendants presented a good faith defense in that the failure to file and the underreporting were caused by sloppy bookkeeping and the illness of an employee.

The government sought to present evidence of "under the table" payments to attack Defendants' good faith defense.  The record is clear that Defendants knew of their tax obligations with respect to the payment of employees, as Defendants partially complied by paying a portion of the salaries by checks with proper withholdings.  Defendants admit that "they committed countless uncharged federal tax crimes." (Elie Abboud Def.'s Br. 29.)  The government's implication was that because Defendants had willfully violated tax laws with respect to payment of employees, Defendants also willfully violated tax laws with respect to the failure to file and the underreporting.

The government also sought to present the evidence to show motive.  The government's theory was that Defendants' motive in perpetrating the check-kiting scheme was based on cash flow problems Defendants were experiencing.  The implication was that Defendants' under the table payments were evidence of this cash flow problem.

#### iii.        Probative Value Versus Unfair Prejudice

The government argued that evidence that Defendants willfully violated the tax laws with respect to the payment of employees was probative as to Defendants' willfulness in connection with the failure to file a tax return and the underreporting of income.  We agree.

In *United States v. Jerkins*, the Court found that the district court did not abuse its discretion when, in a tax evasion case in connection with the sale of illegal drugs, it admitted evidence that the

defendant had made late filings with respect to his 1969, 1970, and 1971 tax returns.  871 F.2d 598, 604 (6th Cir. 1989).  The Court found that for "other acts" evidence, "the prior acts generally must be relevant to a matter at issue and must be substantially similar to, and near in time to, the offense charged in the indictment."  *Id.*  In that case, the Court found that the failure to file tax returns and the evasion of income tax were sufficiently similar in nature and occurred in close proximity to each other.  In this case, the acts of payroll tax violations and income tax return violations are substantially similar so that the district court did not abuse its discretion in the admission of the evidence.

With respect to prejudice, the testimony provided by the government's witnesses was sufficiently succinct so as to minimize prejudice.  Testimony from former employee Donald Slusher was limited to two questions concerning the form of his payment.  Likewise, testimony from former employee Walter Ryder was limited to four questions concerning the form of his payment, and the line of questioning concerning the record keeping of the payroll disbursements was sufficiently limited.

Defendants contend that the district court did not properly weigh the evidence in accordance with Rule 403 in that the court did not offer an explanation on the record for its decision.  The failure of the district court to make findings on the record with respect to its 404(b) decision does not necessitate remand.  If Defendants requested the district court to make such findings on the record, then the district court must do so.  *United States v. Costa-Cazares*, 878 F.2d 945, 950 (6th Cir. 1989) (citing *United States v. Robinson*, 700 F.2d 205, 213 (5th Cir. 1983)).  The record does not show that Defendants made such a request at any point; as a result, their claim must fail.

### iv.    Limiting Instruction

Defendants' key argument with respect to the district court's 404(b) decision is that the district court did not offer a limiting instruction to the jury, so that the evidence was used as substantive evidence of guilt against Defendants.  In its decision denying Defendants' motion for a new trial, the district court stated, "Defendants requested a limiting instruction under Federal Rule of Evidence 404(b) which was denied by the Court.  They contend that the Court erred by allowing the introduction of this evidence without a limiting instruction and that the Jury could have considered it as substantive evidence[8] tending to prove the income tax charges . . . ."  (J.A. at 368.)

The district court's conclusion that "[a]dmission of this evidence without a limiting instruction does not require an entry of judgment of acquittal," (J.A. at 369), was not entirely correct.  As stated, *supra*, the district court must give a limiting instruction with 404(b) evidence.  If the error was not harmless, then we cannot sustain the tax convictions.

Strangely, although the district court stated in its decision denying a new trial that it did not give limiting instructions with respect to the 404(b) evidence, in fact the district court gave such instructions.  When the evidence was introduced at trial, the district court told the jury:

> Ladies and gentlemen of the jury, you have heard testimony that the . . . Defendants committed some acts other than the ones charged in the indictment.
>
> You cannot consider this testimony as evidence that the Defendants committed the crimes that they are on trial for now.  Instead you can only consider it in deciding whether . . . they acted willfully or not by mistake or by accident.

---

[8]We note that 404(b) evidence, if admissible, is substantive evidence; in this case, the 404(b) evidence was substantive evidence of intent, lack of mistake, and motive.

> You may also consider it in connection with the Defendants' motives. These Defendants are on trial only for the crimes charged in the indictment, not of other acts. Do not return a guilty verdict unless the Government proves the crime charged beyond a reasonable doubt.

(J.A. at 539-40.)   At the end of the case, the district court repeated its instruction:

> You have heard testimony that the Defendants committed some acts other than the ones charged in the indictment. You cannot consider this testimony as evidence that either of the Defendants committed the crimes that each is on trial for now.
>
> Instead, you can only consider it in deciding whether it evidences proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
>
> Remember that the Defendants are on trial only for the crimes charged in the indictment, no other acts. Do not return a guilty verdict unless the Government proves the crimes beyond a reasonable doubt.

(J.A. at 1008.)   The record clearly indicates that the district court gave the proper limiting instructions to the jury not once, but twice. Defendants' reliance on the district court's language in its decision to deny a new trial is understandable but misplaced. Having complied with this Court's requirements, the district court's admission of 404(b) evidence was not error.

**E.     THE GOVERNMENT ENGAGED IN PROSECUTORIAL MISCONDUCT IN ITS CLOSING ARGUMENT, BUT THE MISCONDUCT WAS NOT FLAGRANT**

### 1.     Standard of Review

Because Defendants did not object to the alleged misconduct at trial, this Court reviews for plain error. *United States v. Wright*, 343 F.3d 849, 861 (6th Cir. 2003) (citing *United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996)).   "'To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" *Id.* (quoting *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998)).

### 2.     Analysis

#### a.     Legal Framework

The claim of prosecutorial misconduct involves a two-step inquiry.   First, the Court must determine if the government's statements were improper. *United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir. 1996) (quoting *United States v. Carroll*, 26 F.3d 1380, 1384-90 (6th Cir. 1994)).   If the statements were improper, the Court must decide whether the statements were flagrant. *Id.* (quoting *Carroll*, 26 F.3d at 1385).   The flagrancy inquiry requires examination of four factors:

> (1) whether the remarks tended to mislead the jury or to prejudice the accused [including whether the trial judge gave an appropriate cautionary instruction to the jury];
> (2) whether they were isolated or extensive;
> (3) whether they were deliberately or accidentally placed before the jury; and
> (4) the strength of the evidence against the accused.

*Id.* (alteration in the original) (quoting *Carroll*, 26 F.3d at 1385). If the statements were not flagrant, the Court will reverse only if "'(1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction.'" *Id.* (quoting *United States v. Brown*, 66 F.3d 124, 127 (6th Cir. 1995)).

### b.     The Reference to "Under the Table" Payments

In its closing remarks, the government stated, "[t]hey knew what their obligations were, and we also know it because they were cheating on a weekly basis with their payroll. Now, that's not a charged offense, but it does give you evidence of what was going on in their minds when they decided not to file their returns." (J.A. at 1006-07.) Defendants argue this statement "created an unacceptable risk that these impermissible remarks produced elements of irrationality into the jury's decision making process." (Michel Abboud Def.'s Br. 38.) We disagree.

Defendants propose an odd rule: even if evidence is properly admitted as relevant to guilt or innocence, the government may not refer to this evidence a single time in closing remarks. The fact is that the evidence of under the table payments was relevant to establish intent, absence of mistake, and motive. Defendants' statement that "the prosecutor went out of her way to make a derogatory argument about things 'that had absolutely nothing to do with defendant's guilt or innocence,'" (J.A. at 38-39 (quoting *United States v. Stahl*, 616 F.2d 30, 32 (2d Cir. 1980))), is wrong; the evidence went directly to guilt or innocence. As the Second Circuit reasoned, "because this evidence was properly admitted, it was not misconduct for the prosecutor to refer to it in summation." *United States v. Von Foelkel*, 136 F.3d 339, 341 (2d Cir. 1998).

Moreover, the reference to the payments was made once, and the government properly stated the limitation on the evidence. The statement simply was not made to "flame the passions and prejudices of the jury." (Michel Abboud Def.'s Br. 38.)

### c.     The Reference to Defendant's Wealth

In its closing arguments, the government referred to Defendant Michel Abboud's expensive home, his recent purchase of a Mercedes Benz, the fact that he shopped at an expensive department store, and the fact that he sent his children to an elite private school. Defendant accuses the government of inciting class bias.

We find that the statements were improper. The government contends that Defendant first raised the issue of wealth as evidence of lack of motive to commit bank fraud, and that the government merely rebutted this contention by showing that Defendant's "lavish" lifestyle would establish motive to commit bank fraud. Had the government made the comments in closing arguments to show motive for bank fraud, the comments would have been proper. *See, e.g.*, *United States v. Derman*, 211 F.3d 175, 179-80 (1st Cir. 2000), *superseded by statute on other grounds* (finding no misconduct where the prosecution used evidence of the defendant's wealth as motive to commit a crime, and where the defendant had first placed this motive in issue).

The government, however, did not comment about Defendant's wealth in connection with the motive to commit bank fraud; the comments were directed towards Defendant's tax violations. In its brief, the government attempts to sidestep this issue by claiming that Defendant's wealth was in fact a motivation for his tax violations. The problem is that the government did not argue this point in closing:

> Michel achieved the ultimate dream. He was shopping at Sax [sic] Fifth Avenue, sending his children to Hathaway Brown. It is a good life, but with the American dream comes responsibilities, and one of those responsibilities is to file your tax returns. The Abbouds could not be bothered to do that.

(J.A. at 1006-07.)  The picture painted by the government was not that Defendant needed to commit tax violations to support his lifestyle; instead, the government juxtaposed the fact that Defendant was wealthy with the fact that he did not file his taxes and left the jury to use its imagination.  The government did not connect Defendant's wealth to any issue relevant to Defendant's guilt or innocence with respect to the tax violation; its statements in this regard were therefore improper.

The statements, however, were not flagrant.  Addressing the factors listed, *supra*, in order, (1) the purpose of the remarks was to prejudice Defendant; the thinly veiled implication was that Defendant was the stereotypical wealthy individual attempting to avoid his tax responsibilities. (2) The statements about Defendant's wealth were isolated; the government did not make "repeated attempts" to make Defendant's wealth an issue.  *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990).  (3) The statements were part of a deliberate strategy; it was no accident that the government made several consecutive statements concerning Defendant's wealth.  (4) As to the strength of the evidence on this charge, Defendant stipulated to failing to file a false tax return and filing a false tax return; his only defense was lack of intent, which the government attacked with the 404(b) evidence. *See supra*.  An error by Defendant's counsel may be the most telling.  Defendant challenged the sufficiency of evidence for the tax charges at trial in his motion for judgment of acquittal; however, Defendant's counsel inexplicably did not remove a drafting note in the supporting brief in connection with the argument against the tax convictions, which stated, "[NO SUPPORT IN RECORD/NO LEGAL AUTHORITY/DO YOU REALLY WANT TO ARGUE THIS EVEN THOUGH THERE WAS A STIPULATION?]"  (J.A. at 309.)  Apparently, Defendant's counsel conceded that the evidence against Defendant was sufficient to support the conviction, and that there was no evidence or legal authority to prove otherwise.

From these factors, Defendant has not shown flagrancy in the government's closing argument, especially because of the Defendant's admission of committing the underlying conduct. This is not a case where "the prosecutor's actions 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999) (quoting *Donnely v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Because the government's conduct was not flagrant, and because Defendant did not object at trial, this Court will not vacate the conviction for failure to file a tax return on this ground.

## F.   THE DISTRICT COURT DID NOT ERR IN ADMITTING THE EXPERT TESTIMONY OF WOLVERTON

### 1.   Preservation of the Issue

With respect to the introduction of Wolverton's testimony, Defendant Elie Abboud made two objections at trial: (1) "the data upon which [Wolverton] based his opinion was neither collected by him nor prepared by him;" and (2) "[Wolverton] did not render an opinion based on a reasonable degree of banking certainty . . . ."  (J.A. at 956-57.)  Defendant Michel Abboud adopted Defendant Elie Abboud's arguments on appeal.  (Michel Abboud Def.'s Br. 61.)

### 2.   Standard of Review

For the two objections made at trial, this Court reviews the admission of the expert testimony for abuse of discretion.  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002). This Court reviews issues first raised on appeal with respect to the admissibility of the expert testimony for plain error.  *United States v. Swafford*, 385 F.3d 1026, 1031 (6th Cir. 2004).

### 3.      Analysis

#### a.      Objections Made at Trial

##### i.      Collection and Preparation of the Data

Defendants contend that Wolverton's testimony was improperly admitted because he did not collect the data and he did not prepare the data used in his expert opinion.  This argument ignores Federal Rule of Evidence 703, which states, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by *or made known to the expert at or before the hearing.*" (emphasis supplied).  Wolverton testified that he had reviewed the underlying  materials that contained the information inputted into the CKAS system.  As a result, Wolverton could properly form an expert opinion based on this evidence.

##### ii.      Reasonable Degree of Banking Certainty

We are unclear as to what Defendants meant by the phrase "reasonable degree of banking certainty."  If Defendants' argument was that Wolverton did not express his expert opinion in terms of probability or certainty, we disagree.  When asked for his conclusion as to whether check kiting occurred from June 1999 to August 1999, Wolverton testified that his conclusion was that check kiting had occurred, and "that the check kite caused a risk of loss to the banking system and caused an actual loss to the banking system." (J.A. at 824.)  Wolverton did testify that he would not offer an opinion with respect to the time period of 1996 to 1999, because he did not have the underlying checks for that time period; however, Wolverton expressed the relevant opinion with respect to Defendants' convictions in absolute and certain terms.

#### b.      Arguments First Raised on Appeal

##### i.      Wolverton's Limited Testimonial Experience

According to Defendants, "[a]lthough [Wolverton] had previously testified as an expert in money laundering and bank fraud cases, he had not testified in any case involving the money order, check cashing or grocery business." (J.A. at 23.)

We agree with the government that Defendants' argument "misses the point: Wolverton was proffered as an expert in check kiting, not as an expert in grocery or check cashing businesses." (Pl.'s Br. 83.)  As a check kiting expert, Wolverton had extensive experience: he testified as a check kiting expert at 13 trials, and he has worked on 60 to 80 check kiting cases.  Admission of Wolverton's testimony based on his experience was not error, let alone plain error.

##### ii.      Manual Analysis

Defendants claim that Wolverton did not conduct a manual analysis in addition to the CKAS report in order to confirm that report's results.  While Wolverton did not conduct a manual confirmation of the CKAS report, this fact is irrelevant.  The testimony was as follows:

Q.      You know [the CKAS analysis] is not perfect by now, correct?

A.      It is not perfect?  It is a system that I trust, and it is a system that works, and it is a system that is reliable.

Q.      But wouldn't you say that standing alone you could not rely upon the conclusions derived from that to determine whether or not someone was involved in check kiting?

> A.   I think you can get a pretty good idea from looking at that, but I would go farther.
>
> Q.   In fact, in other cases, even when there was just – instead of a lot of checks like in this case there was just a handful of checks, you, after having gone through the CKAS analysis, would still go ahead and do it manually, correct?
>
> A.   Correct.
>
> Q.   You couldn't do it in this case, could you?
>
> A.   I could do a lot of things in this case.  I would not want to attempt to put this type of information on accounting spreadsheets.

(J.A. at 886-87.)  Defendants' argument seems to be that because Wolverton did not manually confirm the CKAS results, these results are somehow suspect; however, this ignores the fact, raised by Defendants, that this manual confirmation only occurred when "instead of *a lot of checks like in this case* there was just a handful of checks." (J.A. at 887 (emphasis supplied).)  Here, when the check kiting scheme was complex, manual confirmation was not standard procedure.  Plain error did not occur in this respect.

### iii.   Failure to Include the Income of Some of Defendants' Businesses

Defendants quibble with the fact that the income from certain businesses of theirs was not accounted for in Wolverton's analysis.  As the government notes, this is because many of these businesses failed to file tax returns.  Moreover, the purpose of accounting for income from these businesses is to compare that income to the volume of deposits; if there is a disproportionate amount of deposits, then this is an indication of check kiting.[9]  In this case, there was a severe disproportion between Defendants' income and their deposits.  Defendants have not shown that the income not accounted for would have been so significant as to alter the proportion such that its omission would have constituted plain error.

### iv.   Carryover

Defendants also argue that the CKAS report did not take into account the fact that the banks allowed a negative balance with the carryover feature.  As explained, *infra*, the fact that the banks allowed a negative balance with the carryover feature did not mean that the banks authorized check kiting.  Furthermore, the primary purpose of the CKAS report was to compare deposits of third party checks with deposits from accounts of Defendants.  The fact that the banks allowed one day of float on the accounts does not change the fact that 92.38% of Defendants' deposits came from their own accounts, and only 7.62% of their deposits came from third parties.

Defendants' basic contention is that they were allowed to run negative balances; they point to the fact that "they had run a negative balance for 665 consecutive days as of November 29, 1999. This was not considered in the CKAS calculations." (J.A. at 27.)  No party disputes the fact that Defendants could run a negative balance.  The question is whether Defendants were kiting checks; here, the ability to run a negative balance would be irrelevant.  If Defendants had run a negative balance for 665 consecutive days, and 100% of their deposits were from third party checks, then the CKAS analysis would have reflected this information and Defendants would not be guilty of check kiting.  The ability to run a negative balance is independent of whether Defendants wrote worthless

---

[9]Defendants' claim that Wolverton did not know the exact number of stores involved in the analysis is irrelevant; the income produced by these stores is the key piece of information.

checks between their accounts to artificially raise the balances.  No plain error occurred in this respect.

### v.        Reliability

Defendants claim that the CKAS methodology was unreliable.  They state the reliability has only been established by the FBI and Wolverton.  Moreover, they claim that the CKAS system may be used only as an investigative tool but not as substantive evidence.

As an initial matter, we note that Defendants bear the burden of proof in demonstrating plain error.  *United States v. Murdock*, 398 F.3d 491, 496 (6th Cir. 2005) (citing *United States v. Vonn*, 535 U.S. 55, 62 (2002)).  In other words, the inquiry is not on the failure of the government to demonstrate reliability, but on Defendants to demonstrate unreliability to the threshold of plain error.  Defendants cannot meet their burden by merely uttering the words that plain error occurred; they must actually demonstrate the error to this Court.

One other circuit has explicitly found the CKAS system reliable.  In *United States v. Yoon*, the Seventh Circuit approved of the system: "our independent review of the trial transcript convinces us that Agent Wolverton's expertise, both as to *his methodology* and his experience, was perfectly fitted to the facts of this case."  128 F.3d 515, 527 (7th Cir. 1997) (emphasis supplied).  There was a perfect fit in that case because the charge was check kiting, Wolverton was a check kiting expert, and the CKAS system was a check kiting analysis.  *Id.*  The same perfect fit exists here.

Defendants claim that the CKAS system is an investigative technique and is not admissible as substantive proof of guilt.  We agree that "[e]very defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officers in investigating criminal activity."  *United States v. Hernandez-Cuartas*, 717 F.2d 552, 555 (11th Cir. 1983).  In that case, the Eleventh Circuit denounced the use of a drug courier profile as evidence of guilt or innocence, as innocent people often met such a profile.  *Id.*

Defendants' argument fails because the CKAS system analyzes substantive evidence that goes directly to guilt or innocence.  "The CKAS is not a 'profiling' system.  It is a detailed analysis of the *actual criminal activity* Appellants conducted."  (Pl.'s Br. 85) (emphasis supplied).  This is not an investigative tool whereby law enforcement looks at non-criminal evidence to aid in its investigation; the CKAS analysis looks at check transactions to determine whether these transactions amount to a criminally fraudulent scheme.

Defendants have not demonstrated unreliability to the extent of plain error; in fact, Defendants proffer no evidence that suggests the CKAS system is unreliable.

### vi.       Dual Role

Defendants claim that the district court failed to properly instruct the jury as to Wolverton's dual role as a fact witness and an expert witness.  We find that no instruction was required, because Wolverton was not a fact witness; he was not the investigating agent and he had no role in gathering evidence.  Instead, he was supplied with the appropriate evidence and rendered an expert opinion based on this evidence.

### vii.      Unfair Prejudice with Computer Generated Evidence

In a reply brief, Defendants raise the argument that computer generated evidence may be unreliable.  (Elie Abboud Reply Br. 7.)  An argument first presented to the Court in a reply brief is waived.  *United States v. Moore*, 376 F.3d 570, 576 (6th Cir. 2004) (citing *Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989)).

### G.    THE EVIDENCE WAS SUFFICIENT TO SUPPORT DEFENDANTS' CONVICTIONS FOR BANK FRAUD AND MONEY LAUNDERING

#### 1.    Standard of Review

When reviewing the sufficiency of evidence in support of a jury verdict, this Court views the evidence in the light most favorable to the prosecution and gives the prosecution the benefit of all reasonable inferences from the testimony. *United States v. Sawyers*, 409 F.3d 732, 735 (6th Cir. 2005). Viewing the evidence in this manner, a jury verdict is supported by sufficient evidence if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (internal quotations omitted). In sum, "a defendant claiming 'insufficiency of the evidence bears a very heavy burden.'" *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) (quoting *United States v. Soto*, 716 F.2d 989, 991 (2d Cir. 1983)).

#### 2.    Analysis

##### a.    Bank Fraud

###### i.    Legal Framework

Section 1344 of Title 18 of the United States Code states, "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice . . . to defraud a financial institution" shall be guilty of bank fraud. In order to prove bank fraud, the government must prove three elements: "(1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC." *United States v. Hoglund*, 178 F.3d 410, 412-13 (6th Cir. 1999).

This Court has held that check kiting is a form of bank fraud. *United States v. Stone*, 954 F.2d 1187, 1190 (6th Cir. 1992). In *Stone*, the Court outlined the mechanics of check kiting:

> Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the kiter covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the "float" time, an artificial balance is created.

*Id.* at 1188 n.1. Check kiting acts as a substitute for a short-term loan. *Id.* at 1188. For example, if the defendant needed $100,000 today but would not have sufficient money for three days, he would write a check for $100,000 on Day 1 from an account with Bank A with insufficient funds. If Bank A has a one day float time, then it would find insufficient funds on Day 2. Before Bank A returned the check, the defendant would write a check for $100,000 on Day 2 from an account with Bank B with insufficient funds. If Bank B has a one day float time, then it would find insufficient funds on Day 3. Before Bank B returned the check, the defendant would write a check for $100,000 on Day 3 from the account at Bank A with insufficient funds. Before Bank A returned the check on Day 4, the defendant would hopefully have received sufficient money and deposited this in the account at Bank A. This process can become extremely complicated with multiple accounts and a large transaction volume between these accounts.

###### ii.    Bank Officials' Purported Approval of Defendants' Actions

Defendants' primary contention is that the bank officials approved of Defendants' check kiting practices. We disagree.

### (a).   PVF

With respect to PVF accounts, Defendants had specific accounts with PVF for use in their check cashing business.  The mechanics of such an account was that Defendants would deposit customer checks that they had cashed into an account on Day 1.  PVF would then give "instant credit" to Defendants, so that they could withdraw the full amount of the checks deposited on Day 1, even though PVF had not received credit from those checks.  On Day 2, PVF would find out which checks deposited were actually good and which were returned by the computer.  As a result, a possibility existed that Defendants' account would be negative, if they had withdrawn on Day 1 an amount that was greater than the actual amount credited on Day 2.

PVF allowed these accounts to become negative, because it had $500,000 in collateral from Defendants.  If the account was negative, Defendants on Day 2 had to deposit funds sufficient to place the balance at zero.

PVF also charged a fee for the "instant credit" given to Defendants on Day 1.  This was in connection with expenses in handling the accounts and for the time value of money.

We agree with Defendants that this system was created for the benefit of Defendants, so that they could have money on Day 1 without having actual deposits until Day 2.  Of course, the banks also benefitted from this arrangement through the fees charged.

The fact that the banks created this system did not give Defendants free license to abuse the system by check kiting.  The purpose of the system was to give Defendants "instant credit" for checks they had cashed, not for checks from Defendants' other accounts with insufficient funds.  Defendants were mixing checks from their own insufficient accounts with checks cashed from customers and depositing these into their accounts.  In other words, Defendants were disguising the fact that they were drawing instant credit with checks from their own accounts.

Defendants seem to be arguing that because they could run a negative balance on PVF Account 1, and because they could run a negative balance on PVF Account 2, they were authorized to cycle checks between Account 1 and Account 2 to artificially inflate the balances of the two accounts.  This is simply incorrect; no one had given them permission to do so.  We find our previous decision in *Stone* to be directly on point.  There, the banks allowed the defendant to run a negative balance for a service charge.  The defendant argued that this system was essentially bank approval of check kiting between accounts where the bank imposed such a charge.  This Court disagreed:

> [The defendant's] elaborate check-kiting scheme was never authorized, negotiated, secured, or known to the bank. . . . "While *simple overdrafts* by themselves may not rise to the level of misapplication of bank funds, the evidence presented in this case showed a complicated scheme wherein a series of worthless checks were systematically written, none of which had any monetary substance." . . . [The bank's] assessment of a service charge did not in any sense confer a right upon [the defendant] to engage in the otherwise illegal activity of check kiting.

*Stone*, 954 F.2d at 1192-93 (quoting *United States v. McKinney*, 822 F.2d 946, 948-49 (10th Cir. 1987)) (emphasis supplied).  Likewise, while bank officials in this case did authorize simple negative balances on Defendants' accounts, no one authorized check kiting.

The testimony of the bank officials proved that they did not give such authorization.  Schimmelman testified that he was notified by Curschman in June of 1999 about suspiciously heavy activity in Defendants' accounts.  Schimmelman and Curschman held a meeting with Defendants in early July to discuss the issue.  There, Schimmelman asked Defendant Elie Abboud if he could

explain the large volume of transactions, to which Defendant Elie Abboud said he could not. Schimmelman testified that he "told [Defendant Elie Abboud] that I thought it looked like it might be kiting, and if it was, it was not legal, and it had to be stopped."**10**   (J.A. at 753.)

This statement unequivocally shows that Schimmelman did not approve of the check kiting. He did not know that Defendants were depositing checks from their own accounts along with the cashed customer checks until Curschman informed him of this fact in June 1999. In other words, he did not previously know about the check kiting; therefore, he could not have approved of it. Moreover, as soon as he found out about the check kiting, Schimmelman warned Defendants that such a practice was illegal and had to be stopped.

The fact is that no bank official approved of the check kiting scheme. Defendant Elie Abboud points to testimony from Schimmelman and Swaney. As explained, *supra*, Schimmelman approved of the negative balances in Defendants' accounts, not check kiting. Swaney elaborated on this procedure by stating that Defendants could run a negative balance as great as the collateral on the accounts. This meant that bank officials approved negative balances with a maximum of $500,000, the value of Defendants' collateral; this did not mean approval for the actual negative balances of $1.6 to $4.5 million Defendants were running during the three-month period in 1999.

Next, Defendant Michel Abboud cites to testimony from John Male as evidence of bank approval of check kiting. The pages to which Defendant cites do not support this contention; in fact, the testimony shows that John Male did not know Defendants were "getting the benefit of carryover," *i.e.*, the benefit of the extra day of float created by the system, until the investigation by Curschman and Schimmelman. (J.A. at 743.) If John Male did not even know about the nature of the accounts, Defendant cannot claim that John Male approved such accounts for check kiting purposes. John Male also testified that because of the investigation, he did not trust Defendants. Either Defendant did not correctly cite to John Male's testimony,**11** or Defendant is being disingenuous with the Court.

Defendant Michel Abboud further cites to the facts that Defendants had "unlimited overdraft protection," and that PVF had the right to offset the negative balances with the collateral. As explained, *supra*, Defendants did not have unlimited overdraft protection; their protection was the value of the collateral, $500,000. Furthermore, the right to offset could hardly be considered a comfort to PVF, considering that the actual negative balances soared considerably above the collateral it held.

### (b).   NCB

Defendants had zero balance accounts in connection with a controlled disbursement system with NCB. The zero balance accounts entailed a system that had two types of accounts: a main account, and separate disbursement accounts. Defendants could write checks drawn from the disbursement accounts. In turn, the disbursement accounts would draw from the main account. If the main account was negative, then NCB would ask Defendants to cover the negative amount.

This system of controlled disbursement did allow Defendants to run a negative balance, but so long as they covered that balance with good funds. As the government correctly notes, "[t]his

---

**10**Defendant Michel Abboud takes substantial issue with whether Schimmelman told Defendants that Defendants had engaged in check kiting, or whether Schimmelman told Defendants that he suspected Defendants of check kiting. (Michel Abboud Def.'s Br. 46-48.) This point is irrelevant with respect to approval of the check kiting scheme, and it is also irrelevant with respect to the defense of good faith. *See infra*.

**11**We find this unlikely, as nothing in John Male's testimony even hints at approval of check kiting.

controlled disbursement account was established with the understanding that 'good funds' would be deposited to cover checks clearing from the zero-balance account. But, [Defendants] did not deposit good funds. Instead, they deposited checks that were not collectible." (Pl.'s Br. 73.)

No NCB official gave Defendants permission to kite checks; in fact, the officials did not even know about the activity until the kite collapsed.

### (c). Star Bank

Defendants also had zero balance accounts with Star Bank. The policy was similar to that of the NCB controlled disbursement system; Defendants could have a negative balance on the main account, so long as they corrected the negative balance at the bank's request.

No official at Star Bank approved of Defendants check kiting practices. In fact, the bank had previously closed Defendants' accounts in 1996 because of suspected check kiting.

### (d). The Victim is the Bank, not the Bank Officials

Finally, even if bank officials did approve of the check kiting scheme, which they did not, this approval would not relieve Defendants of criminal liability, because the victim is the bank as an entity. *See, e.g.*, *United States v. Rackley*, 986 F.2d 1357, 1361 (10th Cir. 1993) ("Defendant confuses the notion of defrauding a federally insured bank with the idea of defrauding its owner or directors. It is the financial institution itself--not its directors or agents--that is the victim of the fraud the statute proscribes.").

### iii. Service Fee

Defendants erroneously claim that because the banks profited from their check kiting scheme, the banks could not be the victim of bank fraud. Even though PVF was receiving fees for the check kiting transactions, these fees were incomplete. By nature, the check kite hid the actual negative balance on Defendants' accounts, so that the fee was calculated with a smaller negative balance than actually existed. In addition, the purpose of the check kite was to act as a loan substitute; the overnight interest rate attached to Defendants' account was 5.05%, whereas a normal open line of credit would have an interest rate of 9%. As a result, PVF was defrauded in two respects: on the base of the interest calculation and the interest rate itself.

In addition, this Court held in *Stone* that the imposition of a service fee did not amount to an authorization of check kiting. 954 F.2d at 1192. There, the Court reasoned, "if we were to adopt [the defendant's] rationale, it would henceforth be perfectly legal for a person to kite checks at any financial institution that levied such a charge. This does not reflect the state of the law, and [the defendant] offers no compelling grounds why it should." *Id.* Even if PVF charged a service fee for its "instant credit," this fact is not a defense for illegal conduct.

### iv. Good Faith Defense

As the district court noted, good faith conduct is a complete defense to bank fraud, as it negates the element of intent. The evidence presented below, however, was sufficient to negate Defendants' defense of good faith.

The evidence shows that Defendants were kiting checks between PVF accounts when Schimmelman and Curschman met with Defendants in July 1999 to express their suspicions. Schimmelman testified that he "told [Defendant Elie Abboud] that I thought it looked like it might be kiting, and if it was, it was not legal, and it had to be stopped." (J.A. at 753.) The evidence shows that Defendants did not stop the check kiting after this meeting, but instead started using

accounts from other banks to perpetrate their scheme.  The district court correctly held that this evidence was sufficient to negate the good faith defense.

Defendant Elie Abboud also exhibited bad faith in his discussions with NCB officials. Defendant Elie Abboud told NCB officials that he discovered the check kiting activity, "he was the one who stopped it and went to Parkview and had explained there was a problem and he was trying to get them to work with him." (J.A. at 484.)  This directly conflicts with the testimony of PVF officials who discovered the check kiting scheme and conducted meetings with Defendants to fix the problem.  Defendant Elie Abboud tried to portray himself as the discoverer of the problem, when in fact the evidence shows he and Defendant Michel Abboud created the check kite system.  If Defendants' actions were truly in good faith, then Defendants would have had no need to try and disguise the events that occurred at the unfolding of the scheme.

### v.      Loss to the Bank

Defendants also claim that after the banks discovered the kite, Defendants were fully cooperative with the banks, paid timely payments, and repaid the kited funds.  While this may be true, this does not relieve Defendants of criminal liability.

For a bank fraud case, the amount of loss is determined at the time of detection, not at the time of sentencing.  *United States v. Sparks*, 88 F.3d 408, 409 (6th Cir. 1996) (citing *United States v. Scott*, 74 F.3d 107, 111-12 (6th Cir. 1996)).  Moreover, "'[t]he fact that a check-kiter enters into a repayment scheme after the loss has been discovered does not change the fact of the loss; such fact merely indicates some acceptance of responsibility.'"  *Scott*, 74 F.3d at 112 (quoting *United States v. Mau*, 45 F.3d 212, 216 (7th Cir. 1995)).  As a result, the fact that Defendants repaid the kited amount after detection does not reduce their culpability.

### b.      Money Laundering

### i.      Legal Framework

Section 1957 of Title 18 of the United States Code states "[w]hoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished" as provided by law.

Defendants provide a framework that is incorrect; they state that to prove money laundering, the government must prove "(1) that Michel Abboud not only conducted the transactions involved, which is conceded, (2) that he knew the funds involved were the proceeds of unlawful activity, and (3) that he knew the transactions were designed to conceal or disguise the nature, location, source, ownership and control of the proceeds involved." (Michel Abboud Def.'s Br. 54-55.)

First, Defendants concede that Defendants engaged in the questioned transactions.

Second, the government is not required to prove Defendants knew the funds were from unlawful activity.  The statute explicitly states, "In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity."  18 U.S.C. § 1957(c). Knowledge of illegality on the part of Defendants is not a requirement.

Third, the statute does not require that the government prove any concealment or disguise of the transaction.  *United States v. Hill*, 167 F.3d 1055, 1069-70 (6th Cir. 1999) ("§ 1957 does not require that the defendant know that the transaction was designed to conceal or disguise the nature, location, source, ownership, or control or the subject proceeds or designed to avoid a transaction reporting requirement under state or federal law.").

### ii.        Application to This Case

Defendants first contention is that if Defendants are not guilty of bank fraud, they are not guilty of money laundering.  Because § 1957 requires a "monetary transaction in criminally derived property," we agree that if the transactions did not include fruits of bank fraud, no money laundering occurred.  The evidence, however, was sufficient to support Defendants' convictions for bank fraud.

Defendants' second contention is that the government did not provide sufficient evidence to show that Defendants concealed or disguised the questioned transactions.  As explained above, § 1957 does not require the government to make such a showing.

## H.        THE DISTRICT COURT ERRED IN ITS SENTENCING DECISION IN LIGHT OF *BOOKER*

### 1.        Standard of Review

Defendants made timely objections to their sentences.  Because Defendants preserved this issue for appeal, the Court reviews for harmless error.  *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005).  "Under the harmless error test, a remand for an error at sentencing is required unless we are certain that any such error was harmless--i.e. any such error 'did not affect the district court's selection of the sentence imposed.'"  *Id.* (quoting *Williams v. United States*, 503 U.S. 193, 293 (1992)).

### 2.        Analysis

Defendants correctly argue that the district court committed error when it sentenced Defendants according to the then mandatory Federal Sentencing Guidelines.  *See United States v. Booker*, 125 S. Ct. 738, 764 (2005) (eliminating the mandatory nature of the guidelines due to constitutional violation).  This error was not harmless, as it did in fact affect the sentences imposed on Defendants.  *See United States v. Oliver*, 397 F.3d 369, 381 (6th Cir. 2005).  We remand the cases to the district court for resentencing.

## III.  CONCLUSION

We **AFFIRM** the convictions of Defendants on all counts, but we **VACATE** their sentences and **REMAND** to the district court for resentencing in light of *Booker*.